UNITED STATES v. TWO HUNDRED CASES OF ADULTERATED TO-MATO CATSUP.

(District Court, D. Oregon. March 9, 1914.)

No. 6232.

1. FOOD (§ 24*)—PROCEEDINGS TO CONDEMN ADULTERATED FOOD—SUFFICIENCY OF EVIDENCE—"ADULTERATED."

In a proceeding to condemn tomato catsup, evidence *held* to show that it was decomposed and "adulterated" within the Pure Food and Drug Act (Act June 30, 1906, c. 3915, § 7, 34 Stat. 769 [U. S. Comp. St. Supp. 1911, p. 1357]).

[Ed. Note.—For other cases, see Food, Cent. Dig. § 17; Dec. Dig. § 24.*

For other definitions, see Words and Phrases, vol. 1, pp. 210–212.]

2. FOOD (§ 6*)—ADULTERATION—STATUTORY PROVISIONS.

Under the provision of the Pure Food and Drug Act (Act June 30, 1906, c. 3915, § 7, 34 Stat. 769 [U. S. Comp. St. Supp. 1911, p. 1357]) that a food product is adulterated if it consists in whole or in part of a filthy, decomposed, or putrid animal or vegetable substance, no standard being fixed by which it can be determined when the product has reached such a stage of decomposition as to consist wholly or partly of filthy, decomposed, or putrid substance, each case must be determined on its own facts, and a product which is so far decomposed as to be unfit for food is within the meaning of the statute.

[Ed. Note.—For other cases, see Food, Cent. Dig. § 6; Dec. Dig. § 6.*]

3. FOOD (§ 6*)—ADULTERATION—STATUTORY PROVISIONS.

Under the provision of the Pure Food and Drug Act (Act June 30, 1906, c. 3915, § 7, 34 Stat. 769 [U. S. Comp. St. Supp. 1911, p. 1357]), declaring that a food product is adulterated if it consists in whole or in part of a filthy, decomposed, or putrid animal or vegetable substance, the interstate shipment of such a product is prohibited whether or not its use would be injurious to health.

[Ed. Note.—For other cases, see Food, Cent. Dig. § 6; Dec. Dig. § 6.*]

Libel by the United States for the condemnation of two hundred cases of adulterated tomato catsup. Decree in favor of the government.

E. A. Johnson, Asst. U. S. Atty., of Portland, Or.

Platt & Platt, of Portland, Or., for claimant.

BEAN, District Judge. The United States, proceeding under the Pure Food and Drug Act (34 Stat. at Large 770), filed a libel in this

court for the condemnation of 200 cases of tomato catsup, alleging that it was adulterated within the meaning of the act, which declares that a food product is deemed to be adulterated "if it consists in whole or in part of a filthy, decomposed, or putrid animal or vegetable substance." After the seizure, the product was claimed by the company which manufactured it and the proceedings defended. The claimant admits the interstate shipment and other jurisdictional facts, but denies that the catsup was decomposed or adulterated within the meaning of the law.

[1] By stipulation of the parties, the case was tried before the court without a jury. It turns upon two questions: First, whether the product was in fact decomposed; and, if so, whether it was "adulterated" as defined by the Pure Food Law. It was manufactured from pulp screened from peelings, cores and by-products of tomatoes, obtained in the course of their preparation for canning. The decay or decomposition of tomatoes or tomato products is commonly the result of the attack upon the fruit in the field, or in process of manufacture, of various forms of plant life, such as yeast, bacteria, and mold. They feed upon certain compounds in the fruit, reducing the food value of the product, and producing a by-product of a more or less offensive character, and are evidences of decay and decomposition. The condiments used in the manufacture of tomato catsup have the effect of concealing decomposition or putrefaction from the senses, and its existence can most readily be determined by a bacteriological analysis of the manufactured product to ascertain whether the organisms referred to are present in sufficient quantities to indicate a decomposed state.

Various samples of the product in question have been carefully analyzed under the microscope, separately, by Dr. Schneider, of the University of California and the Government Laboratory in San Francisco, and Prof. Beckwith, of the Oregon Agricultural College, both of whom are expert bacteriologists, and they agree that it contains bacteria, yeast, and mold in very large and unusual quantities, as high as from 350 million to 1 billion bacteria and 15 million yeast spores per cubic centimeter (about one-quarter of a teaspoonful) and mold hyphæ in abundance, thus indicating, in the opinion of these experts, a largely decomposed condition, Dr. Schneider says from 10 to 15 per cent., and according to their testimony it is unfit for human food. This testimony is not contradicted in any way, although the claimant was permitted to and did take samples of the goods for analysis after their seizure. Nor is there any conflict among the experts as to the scientific deductions to be made therefrom. It would seem conclusive therefore of the fact that the product is decomposed in part or in whole. The examination of the bacteriologists is confirmed by a chemical analysis made by the chemist at the government laboratory, and in my judgment finds support in the method of manufacture. The evidence shows that the fruit from which the product in question was manufactured was brought to the factory in car load lots in boxes containing about 50 pounds each. Without being sorted or examined in any way except the merest visual examination of the outer layer of

fruit, the contents of the boxes were emptied for washing into a vat containing about 150 gallons of water, which was only changed once a day, except as it might be affected by a one-inch stream running into the vat and an overflow pipe at the top. While in the water the tomatoes were stirred by a mechanical screw-like agitator, which subsequently carried them to the steaming table, where they were scalded with hot water to loosen the skin, and washed under a spray of cold water. From there they were taken in buckets to the peeling table, where the skins were removed and the tomatoes graded for canning. Then the skins, with such pulp as adhered to them, the stem ends, and like by-products were placed in buckets by the operatives and subsequently taken to another department of the factory, where they were used in the manufacture of the catsup in question.

The washing of a large quantity of fruit which necessarily is more or less infected with bacteria, mold, and decay in the manner described, would naturally have a tendency to foul the water and infect the entire lot, and especially the skins and by-product from which the catsup in question was manufactured. Again, the claimant depended on the peelers or sorters to sort out and reject the decayed portions from the trimmings before they were sent to the catsup department. The peelers were paid by the piece for the peeled tomatoes only, and it is but natural that they would become careless or indifferent about the removal of the decayed material from that portion of the output for the handling of which they received no direct compensation. It therefore seems to me that the method of manufacture adopted by the claimant was calculated to produce just such a product as the bacteriologists found the one in question to be. Better methods of handling the fruit are in vogue, for it is in evidence that in other factories, the output of which was shown to be unobjectionable, the tomatoes were sorted and the decayed or infected ones removed before being washed, and were washed in perforated metal cylinders by sprays of clean water.

If the testimony in this case is to be considered, and it is uncontradicted, there is in my judgment but one conclusion which can be reached, and that is, the product in question was decomposed and adulterated within the meaning of the Food and Drug Act.

[2, 3] It is argued for the claimant that since the presence of bacteria, mold, and yeast in any quantity is evidence of decomposition or the process of decomposition, and there is no fixed standard by which it can be determined when a product has reached such a stage of decomposition as to "consist in whole or in part of filthy, decomposed, or putrid vegetable substance," the government cannot prevail. I infer from the testimony of the experts that it would be difficult, if not impossible, to fix any arbitrary standard by which the question could be determined, as it depends upon so many contingencies. In any event, no such standard has been fixed, in the absence of which each case must be determined on its own facts, and when it appears, as in this case, that the product is so far decomposed as to be unfit for food, it comes within the letter and spirit of the law. It was also urged that, since there is no proof that the product in question would be injurious to health, a verdict should be ordered in favor of the claimant; but I

do not understand that such proof is necessary or required under the provisions of the Food and Drug Act, on which this proceeding is based. The object of the law is to prevent the manufacture or interstate shipment of adulterated food, and, when food is adulterated so as to "consist in whole or in part of filthy, decomposed, or putrid animal or vegetable substance," its interstate shipment is prohibited, whether its use would be injurious to health or not.

The recent decision of the Supreme Court, while not at hand, involved, as I understand from the press report, the construction of the fifth subdivision of section 7, and not the one involved in this controversy.

. I conclude, therefore, that the motions for nonsuit and directed verdict should be overruled, and that a decree should be entered in favor of the government, as prayed for in the libel.