## UNITED STATES v. 133 CASES OF TOMATO PASTE.

### No. 192.

District Court, E. D. Pennsylvania.
March 3, 1938.

Edward A. Kallick, Asst. U. S. Atty., of Philadelphia, Pa., and J. Cullen Ganey, U. S. Atty., of Bethlehem, Pa.

Adrian Bonnelly, of Philadelphia, Pa., for defendant.

MARIS, District Judge.

The United States has filed its libel in this case seeking the confiscation and condemnation under the Food and Drugs Act, as amended, 21 U.S.C.A. § 1 et seq., of 133 cases, more or less, each containing 100 cans of tomato paste, shipped by Harbor City Food Corporation from California to Cacciola Bros. in Philadelphia for sale.

516

From the evidence I make the following special findings of fact:

The tomato paste in question was manufactured in July, 1935, by the Harbor City Food Corporation at its plant in Harbor City, Cal. The paste was manufactured from tomatoes purchased by the corporation from farmers and delivered at its plant. Many of these tomatoes were infested with the corn ear worm. This worm, after hatching upon the tomato plant, crawls under the calyx of the developing fruit and burrows down into the core where it carries on its feeding operations and deposits its excreta.

Careful inspection of the individual tomatoes entering a plant is necessary in order to detect and reject tomatoes containing corn ear worms or their excreta. At the time of the manufacture of the tomato paste involved in this case a proper and adquate inspection of the tomatoes entering its plant was not maintained by the Harbor City Food Corporation. As a result, a large number of tomatoes containing corn ear worms and their excreta were used in the manufacture of the paste.

In the course of manufacture of the paste the tomatoes and the worms contained in them are broken up into very small fragments and pulped. In the finished product the worm fragments cannot be detected by the consumer either by sight or taste, nor do they render the tomato paste injurious to the consumer's health. In fact, they can normally be detected only by a microanalyst.

The microanalysis by government chemists of 33 samples of the tomato paste involved in this case indicated that it contained on the average about 85 fragments of the corn ear worm in each 200 cubic centimeters.

### Discussion.

The confiscation and condemnation of this tomato paste is sought by the government under section 10 of the Food & Drugs Act, 21 U.S.C. § 14, 21 U.S.C.A. § 14, which provides that "any article of food * * * that is adulterated * * * and is being transported from one State * * * to another for sale, * * * shall be liable to be proceeded against in any district court of the United States within the district where the same is found, and seized for confiscation by a process of libel for condemnation." Section 7 of the act, 21 U.S.C. § 8, 21 U.S.C.A. § 8, provides, inter alia, that "an article shall be deemed to be adulterated * * * in the case of food

* * * if it consists in whole or in part of a filthy *, * * animal or vegetable substance." The uncontradicted testimony showed, as I have found, that this paste contained a large number of worm fragments. It is the contention of the government that the presence of these worm fragments, although not subject to detection by ordinary means and not injurious to health, stamped the paste as a filthy vegetable substance within the meaning of the act. With this contention I agree.

It is clear that the act does not require a food substance to be injurious to health in order to be filthy within the meaning of the statutory definition. A. O. Andersen & Co. v. United States, 9 Cir., 284 F. 542. It is equally clear that the apparent presence of worms and their excreta in food designed for human consumption renders it filthy within the meaning of the act. Galt v. United States, 39 App.D.C. 470. There can be no doubt that this section of the act was designed to protect the æsthetic tastes and sensibilities of the consuming public and that the visible presence of such material in food would offend both.

Conceding this, the claimant argues that the statute is directed only to filth which is perceptible by the consumer. With this I cannot agree. To so interpret this section of the statute would largely deprive the public of the protection it seeks to give. The consumer ordinarily requires no governmental aid to protect him from the use of food products the filthy adulteration of which he can see, taste, or smell. What he really needs is government protection from food products the filthy contamination of which is concealed within the product. I am quite clear that it is the intent of the statute to bar such products from the channels of interstate commerce.

It may well be that such an adulteration might be so slight as to be de minimis. The state of the art of producing a food product may be such as to render it impossible in practice to eliminate entirely all such contamination. There was evidence in this case that the Food and Drug Administration has established a tolerance as to worm fragments in tomato products. The number of such fragments present in the tomato paste involved in this case, however, is not within that tolerance, and is shown by the evidence to be far more than would have been present had proper methods of inspection been followed. It must,

therefore, be held to be adulterated within the meaning of the Food and Drugs Act.

I accordingly reach the following conclusions of law:

The tomato paste involved in this proceeding consists of a filthy vegetable substance and is, therefore, an adulterated article of food within the meaning of the Food and Drugs Act.

It is, therefore, liable to be confiscated and condemned under the provisions of section 10 of that act, 21 U.S.C.A. § 14.

A decree for the confiscation and condemnation of the tomato paste seized in this case may be entered.