UNITED STATES v. 449 CASES, MORE OR LESS, CONTAINING TOMATO PASTE.

No. M–1566.

United States District Court,
E. D. New York.

April 8, 1953.

Frank J. Parker, U. S. Atty., by Gerard E. Molony, Asst. U. S. Atty., Brooklyn, N. Y., for the United States.

Leo Sussman, New York City, for claimant.

BYERS, District Judge.

This is a seizure proceeding under the Food and Drug Act, 21 U.S.C.A. § 301 et seq., involving 449 cases each containing 10 ten-pound cans of tomato paste out of a shipment of 500 slatted wooden cases, which were landed in this District on April 9, 1951, the entry being in bond. The import cost, including duty, etc., was in excess of $9,000.

On April 10, 1951 samples were taken, namely five cans, by the Federal Security Agency, under the Federal Food etc., Act, and on the same day the importer received a notice not to dispose of his merchandise pending word from the Food and Drug Administration.

Under date of April 16, 1951 the claimant received Claimant's Exhibit A, namely an official notice from that Department that the goods need not be further held. Then the importer paid for the merchandise, plus the duty and other charges in connection therewith. His testimony is uncontradicted that the purchase price was payable by a letter of credit, and that his contract of purchase provided that payment should be withheld until the U. S. Food and Drug Inspection Service had passed and approved the merchandise.

Having received Claimant's Exhibit A, he paid the purchase price and other charg-

es as stated, and removed and sold fifty cases from the entire lot. No complaint in reference thereto has ever been made.

On July 2, 1951, the Government Witness Sheehan, being a food inspector of imported merchandise, went to the Bush Terminal dock 53, where this paste was being held, to make a survey "to see if bonded imports were properly stored." He said that he noted that some of these cases had been recoopered, and that nine of the tins had been resoldered. On July 6, 1951 he took three assorted re-soldered tins for samples, and noted that the soldered spots looked to be new. Those tins were properly identified. In the course of this survey, he opened twenty cases in all. Thus, 200 tins were exposed to his view of which nine had been resoldered. He testified on redirect that he was not looking for tomato paste when he made this survey and didn't know it was on the pier.

As to these three tins, a mould count was made by Grace E. Sly, a chemist employed by the Government, and she explained her procedures and her findings, as to each of the three cans.

All expert testimony on this subject will be later tabulated. The respective findings present the only contested issues in the case, which explains the narrative rather than itemized form of this recital.

Seemingly nothing was done by the Department until August 24, although there must have been communication with the claimant because on the latter day the witness, North, also an inspector, kept an appointment at the pier when he removed ten cans, i. e., one from each of ten cases, as did the claimant, the cans being adjacent as to each removal. These cans had no soldered spots and it is a reasonable inference that the Government was not satisfied to proceed pursuant to its findings as to the first three soldered cans, which contained a clot of moulded content under the soldered patch; the clot was first removed, and a test was made as to the balance of the contents of the can; therefore a new inspection was ordered on August 24 and the contents of unpatched cans were tested, according to the witness Krinitz, and he stated the results of his counts, listed below.

The Department's witness Eisenberg also tested samples from these cans.

Finally the claimant's witness Chiano, senior chemist from the Swartz Laboratory, made a mould count, at the instance of the claimant, from the cans taken on August 24, 1951 with the results to be stated.

The four tests, three by the Government and one by the claimant, yielded the following results:

| | Government's Tests | | Claimant's Tests |
| --- | --- | --- | --- |
| U. S. Lab. Initial Tests | Krinitz U. S. Chemist | Eisenberg U. S. Chemist | Chiano Private Chemist |
| 8 | 42 | 60 | 50 |
| 38 | 46 | 60 | 49 |
| 38 | 57 | 56 | 46 |
| 30 | 46 | 54 | 30 |
| 34 | 38 | 58 | 42 |
| | 48 | 70 | 38 |
| | 55 | 54 | 37 |
| | 25 | 44 | 24 |
| | 61 | 60 | 37 |
| | 12 | 44 | 32 |
| Av. 29.6 | Av. 43 | Av. 56 | Av. 38.5 |

The foregoing were obtained as the result of employing a standard procedure, namely, the official mould count published in the Book of Methods of Official Agricultural Chemists, 5th Edition.

Concededly there is an administrative tolerance of 40% of positive fields for tomato paste as to the United States and 50% as to Canada. This considerable range perhaps points to a lack of certainty concerning the precise effect upon the chemistry of the human body of the condition revealed by the several analyses which have been tabulated. Mould, of course, represents a stage in the process of decomposition, but it is familiar knowledge, for instance, that mould is present in cheese, which so far from rendering it unfit for human food accomplishes the direct opposite according to the taste of the individual; we are told that penicillin is a mould product. Therefore it would seem that the Government's proof in this case should have been more informing than it was in this connection.

The discrepancy revealed in the findings as above stated by the two Government chemists who testified is wider than might be expected as the result of conducting uniform tests upon the same subject matter, which ought to yield reasonably uniform scientific results, while what actually appears is that Eisenberg's low count is 44 and his high count is 70, while Krinitz's low count is 12 and his high is 61. The average of the former is 56, and of the latter 43.

The initial Government tests made in the New York Laboratory as the result of which the shipment was released, conducted in the same way, yielded a low count of 8 and a high count of 38. Thus the Government witnesses are shown to be in conflict.

Chiano's findings show a low count of 24 and a high of 50, with an average of 38.5. (He said 39.7 on the stand.) One of the experts was asked if all mould is deleterious, and the answer of counsel was that it was no part of the Government's case to demonstrate that the seized shipment is such in fact. He said that reliance was had upon the language of the statute, namely Title 21 U.S.C.A. § 342, headed, "Adulterated Food," of which section a(3) reads:

> "if it consists in whole or in part of any filthy, putrid, or decomposed substance, or if it is otherwise unfit for food".

In order to justify such a drastic procedure as the Government here seeks to employ, it is the view of this Court that the mere assertion of the results of the mould counts made in connection with this seizure does not demonstrate that these cans of tomato paste are shown to have fallen within the prohibition of the above statute; in other words, viewing the case as a whole it is concluded that the Government has not carried its burden of proof that the tomato paste which is the subject of this cause was adulterated within the meaning of the Federal Food, Drug and Cosmetic Act. It is to be remembered that the first analysis made by the Government chemist which appears in the foregoing tabulation was destructive of the Government's entire case, from which it follows that its burden of proof was very much heavier than would have been true in the absence of such a showing.

Accordingly, the order of condemnation which the Government seeks will be denied, and the release of the shipment is hereby directed. Settle order.