UNITED STATES

v.

**449 CASES, CONTAINING TOMATO PASTE.**

No. 166, Docket 22923.

United States Court of Appeals, Second Circuit.

Argued Feb. 2 and 3, 1954.

Decided April 22, 1954.

Leonard P. Moore, U. S. Atty., Brooklyn, N. Y. (Warren Olney III, Asst. Atty. Gen., Gerard E. Molony, Asst. U. S. Atty., Brooklyn, N. Y., John T. Grigsby, Atty., Dept. of Justice, and Leonard D. Hardy, Atty., Dept. of Health, Education, and Welfare, Washington, D. C., on the brief), for libelant-appellant.

Leo Sussman, New York City, for claimant-appellee.

Before CLARK, FRANK, and HINCKS, Circuit Judges.

CLARK, Circuit Judge.

This appeal concerns a seizure proceeding under the Federal Food, Drug, and Cosmetic Act involving 449 cases of tomato paste allegedly "adulterated" within the meaning of § 402(a)(3) of that act, 21 U.S.C. § 342(a)(3). The government as libelant has sought—so

far unsuccessfully—condemnation of the food in question upon a showing that it contained tissues rotted, but not necessarily deleterious to health.

The tomato paste, imported from Portugal, was landed in Brooklyn in the Eastern District on April 9, 1951, the entry being in bond. Representatives of the Federal Security Agency took samples for inspection; and on April 16 claimant, A. Fantis, the importer, received official notice from the Food and Drug Administration that the goods need not be further held. Claimant thereupon paid for the shipment and removed and sold fifty cases from the entire lot. In July, however, a government food inspector, checking the warehouse, noticed that several of the cases had been recoopered; and closer inspection revealed that several cans had been resoldered. This discovery led to a retesting of the shipment, which disclosed the presence of mold in the tomato paste in quantities exceeding administrative tolerances. The instant proceedings ensued.

It is undisputed that mold in tomato products indicates decomposition. It is also undisputed that when, as here, it results from rot in the tomatoes present before processing, it is not visible to the naked eye, but is detectable only by microscopic examination. Libelant at the trial did not offer proof that the paste was deleterious or unfit for food, in any way other than the decomposition, but contended that it was no part of the government's case to go beyond the showing made as to decomposition. Thereafter the district judge filed an opinion holding that the government had not sustained its burden of proof and that the shipment should be released to the claimant. D.C.E.D.N.Y., 111 F. Supp. 478. Libelant appeals from the resulting order.

■ Section 402(a)(3) provides that a food shall be deemed to be "adulterated," and hence subject to condemnation under § 304(a), 21 U.S.C. § 334 (a), upon shipment in interstate commerce: "if it consists in whole or in part of any filthy, putrid, or decomposed substance, or if it is otherwise unfit for food." The district court apparently read "unfit for food" as limiting the entire section by virtue of the word "otherwise," and as requiring a showing that the product was deleterious. It is this construction which presents the issue on appeal. The point is novel in this circuit, though it has been decided by several other courts which have uniformly held that the government need not prove unfitness for food other than filth or decomposition. Bruce's Juices, Inc., v. United States, 5 Cir., 194 F.2d 935; Salamonie Packing Co. v. United States, 8 Cir., 165 F.2d 205, certiorari denied 333 U.S. 863, 68 S.Ct. 744, 92 L.Ed. 1142; United States v. 1851 Cartons Labeled in Part H. & G. Famous Booth Sea Foods Whiting Frosted Fish, 10 Cir., 146 F.2d 760; United States v. 935 Cases, More or Less, Each Containing 6 No. 10 Cans of Tomato Puree, D.C.N.D. Ohio, 65 F.Supp. 503; United States v. 44 Cases, etc., Viviano Spaghetti with Cheese, D.C.E.D.Ill., 101 F.Supp. 658, 663; see also United States v. Lazere, D.C.N.D.Iowa, 56 F.Supp. 730; United States v. 184 Barrels Dried Whole Eggs, D.C.E.D.Wis., 53 F.Supp. 652; and the monographic comment, Developments in the Law—The Federal Food, Drug, and Cosmetic Act, 67 Harv.L.Rev. 632, 644. This unanimity of view is itself impressive; moreover, we think the conclusion it represents is required both by the statutory language and by the history and general pattern of the legislation.

The entire subject matter of this subdivision of the statute is covered by two co-ordinate "if" clauses; and the second "if" indicates plainly that the second clause introduced thereby is co-ordinate and independent, rather than a qualification of the antecedent clause. The first clause expressly bans all products composed in whole or in part of any filthy, putrid, or decomposed substance; and the second clause goes on to add to the ban substances which were unfit for food for any other reason.

Furthermore, the other subdivisions of § 402(a) make specific reference to products which are "poisonous," "deleterious," "injurious to health," or "the product of a diseased animal." These provisions cover those cases where danger to health is direct and demonstrable. The specific listed characteristics are clearly essential elements to be proved in actions under those provisions which refer to them. But in the first clause of § 402(a)(3) the sweeping ban of products consisting in whole or in part of any decomposed substance without reference to their effect on health is not made to depend on any such additional props or findings to support the ultimate conclusion requiring the ban. It may well be that, in the judgment of the legislators, the presence of any substantial amount of rot in any food product was a sign of danger sufficiently pointed to justify and require the exclusion of the product from unrestricted circulation in interstate commerce. Or we may accept an acute suggestion of Judge Maris in United States v. 133 Cases of Tomato Paste, D.C.E.D.Pa., 22 F.Supp. 515, 516, that this section "was designed to protect the aesthetic tastes and sensibilities of the consuming public," and that the presence of such material in food, whether "perceptible by the consumer" or not, would offend both. For present decision it matters not which rationale is preferred, since in either event congressional power is clear and is not now challenged.

It should be noted also that the further class of adulterated foods thus added, i. e., "otherwise unfit for food," is a broad general classification allowing "the widest variety of reasons for condemning a food," 67 Harv.L.Rev. 632, 645, and not limited to either proof of filth or decomposition or to conditions deleterious to health. See, e. g., United States v. 24 Cases, More or Less, D.C.Me., 87 F. Supp. 826, 827, (canned herring roe of a " 'tough, rubbery consistency' "), and cf. United States v. 298 Cases, etc., Ski Slide Brand Asparagus, D.C.Or., 88 F. Supp. 450 (dealing with "stringy asparagus"); and Steffy, "Otherwise Unfit for Food"—A New Concept in Food Adulteration, 4 Food Drug Cosmetic L. Q. 552 (1949) (citing a variety of examples). There is therefore no basis for equating unfitness for food with injury to health, and the assumed logical progression from decomposition to unfitness for food to injury to health as showing identic terms thus doubly fails.

The conclusion of these authorities, following the statutory language, that the phrase "unfit for food" is not constrictive, but rather is additional or cumulative, is of controlling importance here. Any attempt to develop a constrictive meaning runs into the difficulty—highlighted by the statutory history developed below—that there is literally no place to which the argument may lead. As appears, complete identification of this phrase with "injurious to health" is universally excluded. But it is manifestly impossible to work out some *tertium quid*, of content sufficient to be grasped and acted upon by government inspectors or courts, of matter which is worse than "filthy, putrid, or decomposed," but still less than injurious to health. At most, search for such an intermediate ground can only suggest something by way of a greater *degree* of filthiness or putridity, perhaps along the line of the government tolerance actually allowed, or, if not this, something hopelessly vague and variable, dependent upon the taste buds or olefactory senses of the inspectors and too shifty a basis to serve as embodiment of congressional intent of drastic prohibition with both civil and criminal sanctions. So it is not surprising that no precedent or authority actually supports such a classification. And so the argument for restrictive interpretation of the statute slips insensibly, although perhaps necessarily, into an identification of food unfitness with health injury. This becomes even more manifest upon an examination of the statutory history to which we now turn.

The particular definition of adulterated articles here involved—§ 402(a)(3) supra—goes back to the original Federal

Food and Drugs Act of June 30, 1906, which in § 7, 21 U.S.C. § 8, provided that an article "shall be deemed to be adulterated * * * Sixth. If it consists in whole or in part of a filthy, decomposed, or putrid animal or vegetable substance, or any portion of an animal unfit for food, whether manufactured or not, or if it is the product of a diseased animal, or one that has died otherwise than by slaughter." It will be noted that this limits the phrase "unfit for food" to animal matter and unmistakably separates it from the reference to "filthy, decomposed, or putrid animal or vegetable substance." And so the uniform construction of the early act afforded "decomposed" an unrestricted meaning, requiring no proof of injury to health, e. g., A. O. Andersen & Co. v. United States, 9 Cir., 284 F. 542; United States v. 133 Cases of Tomato Paste, supra, D.C.E.D. Pa., 22 F.Supp. 515; Knapp v. Callaway, D.C.S.D.N.Y., 52 F.2d 476; United States v. Two Hundred Cases, More or Less, of Canned Salmon, D.C.S.D.Tex., 289 F. 157; United States v. Krumm, D.

C.E.D.Pa., 269 F. 848; United States v. Two Hundred Cases of Adulterated Tomato Catsup, D.C.Or., 211 F. 780.[1]

On the same day that Congress enacted the Food and Drugs Act, 34 Stat. 768, it enacted the parallel and complementary Meat Inspection Act of 1906, 34 Stat. 674—a temporary measure which was permanently re-enacted in identical language in 1907, 34 Stat. 1260. The provisions for inspection of meat in this companion act continuously use the language "unfit for human food," sometimes with "otherwise," 21 U.S.C. §§ 71, 72, 76, 92, and sometimes without, 21 U.S.C. §§ 74, 89. The full phrase, as later used in § 402(a)(3) supra of the present act, therefore goes back to this time; and the several usages in the various sections, taken separately or cumulatively, and in their respective settings, are only rationally to be interpreted as adding an additional—not a delimited—class of banned products. When the phrase appears presently in § 402(a)(3), it clearly should have the same significance.[2]

1. In examining these cases it is necessary to bear in mind the distinction adverted to in the text between "unfit for food" and "injurious to health" and the inveterate tendency to slip into a complete identification of the two. What these cases are deciding is that the latter is unnecessary for the statutory violation, and occasional references to the former, separated from context, are imprecise and obviously not intended as definition. A good example is A. O. Andersen & Co. v. United States, 9 Cir., 284 F. 542, 544, where, in reaching its clear-cut holding, the court did quote from other cases and itself refer to the product affirmatively within the prohibition as that which was "'so far decomposed as to be unfit for food'." But this is description, not definition or restriction. Thus the court went on to hold that "while a small percentage of adulteration, found only in a small percentage of the product, might not and would not ordinarily satisfy the court or jury that the whole product is adulterated, yet in a case like this, where the jury might properly infer or find that approximately one-fifth of the entire product was unfit for human consumption, and that the adulteration extended to the entire product, no such question

can arise." 284 F. at page 545. Thus as to four-fifths of the product, there was still adulteration, albeit no proof of unfitness for food. So in none of these cases is attempt made to solve the dilemma which would have been presented by the converse ruling as to what could be a food unfitness more than putridity, filth, or decomposition and less than injurious to health.

2. It is suggested that since, as in 21 U.S. C. § 72, the phrase "or otherwise unfit for human food" follows the words "unsound, unhealthful, unwholesome," it is restricted in meaning to deleterious to health. But this will not do for several reasons. First, it does violence to the language used. "Unhealthful" may perhaps suggest the urged meaning, but surely neither "unsound" nor "unwholesome" carries any such connotation. This is made doubly clear by the other usages throughout these sections. These are too numerous to quote in detail, but they support the inclusive meaning ascribed by the precedents. Thus 21 U.S. C. § 72 has several variations, e.g., "sound, healthful, wholesome, and fit for human food"; "unsound, unhealthful, unwholesome, or otherwise unfit for hu-

Thus Congress, when it enacted the present provisions, was aware of the broad construction placed on the earlier wording, as shown by the uniform course of case precedent supra; and the Act of 1938 here follows the earlier act so closely that an intent to restrict the provisions in material respect is not to be inferred. Sen.Rep.No. 361, March 13, 1935, on S. 5, Cal. 375, 74th Cong., 1st Sess., states: "* * * the provisions of Section 301(2), (3) and (5) [later incorporated into 21 U.S.C. § 342(a)] dealing with filthy food and food from diseased animals are essentially the same as those of the present law."[3] Moreover, amplification, rather than restriction, of power, is indicated elsewhere in the 1938 Act, as in the definition of adulterated drugs and devices in 21 U.S.C. § 351(a), which separates even by numbered clause and semicolon those consisting (1) of "any filthy, putrid, or decomposed substance" from those, (2) and (3), which are "injurious to health."[4] So, viewing the key phrase here in the light of history and the overall pattern of the legislative intent, we are clear that it must receive the same construction when applied to tomato paste as when applied to meat or drugs or oleomargarine or butter. It follows

that we find correct, and agree with, the modern current of authority cited at the beginning of this opinion.

It is of course true, as is often pointed out, e.g., 67 Harv.L.Rev. 632, at 644, 696, that the power granted is very broad, and "literal application of the statute could lead to unjustified harshness." But Congress has attempted to meet this difficulty by granting a large measure of discretion to the administrator, originally the Secretary of Agriculture, later the Federal Security Administrator, and now the Secretary of Health, Education and Welfare. In addition to provisions not here immediately pertinent for regulations making certain exemptions or granting certain tolerances, 21 U.S.C. §§ 345, 346, there is a significant provision in the chapter authorizing penalties, injunctions, and seizures that nothing therein "shall be construed as requiring the Secretary to report for prosecution, or for the institution of libel or injunction proceedings, minor violations of this chapter whenever he believes that the public interest will be adequately served by a suitable written notice or warning." 21 U.S.C. § 336. Obviously the Congress considered such administrative control a wiser course than the hedging of power by various theoretical restrictions, the negativ-

man food"; "unsound, unhealthful, unwholesome, or in any way unfit for human food"; and a final duplication of the *second phrase quoted*; and 21 U.S.C. § 74 ties the phrases to meat containing dyes or preservatives, etc. Second, since meat products were not exempted from the Food and Drugs Act until 1938, 21 U.S.C. § 392, inspection and condemnation under, e.g., § 72 supra must mesh with and parallel the definition of adulteration under the former § 7, 21 U.S.C. § 8, supra. And third, the attempted interpretation runs into the cul-de-sac referred to above of complete identification of unfitness for food with injury to health.

3. The report of the House Committee on Interstate and Foreign Commerce on S. 5, H.R. 2139, 75th Cong., 3d Sess., Apr. 14, 1938, declares that the bill "amplifies and strengthens the provisions to safeguard the public health." The report makes no reference to the change in § 402

(a) (3), 21 U.S.C. § 342(a) (3), under discussion, but, in treating of the section as a whole, discusses several major extensions of the definition of "adulterated" not here relevant. There is no suggestion of any intent to restrict the powers of the administrator.

4. In the most recent legislation on the subject, that of 1950 removing previous shackles on the sale of oleomargarine, the same pattern appears. Thus Congress added a new subdivision, (e), to this definition of "adulterated" food, § 402, 21 U.S.C. § 342, viz.: "If it is oleomargarine or margarine or butter and any of the raw material used therein consisted in whole or in part of any filthy, putrid, or decomposed substance, or such oleomargarine or margarine or butter is otherwise unfit for food." The complete separation of the last clause from the earlier part of the provision is thus clearly manifest.

ing of which might be difficult of proof, in a particular case. And its wisdom is indicated in this very case, where the product is prepared for and sold in quantity distribution, in cans of "Net Contents 10 Lbs. About" of concentrated paste, thus indicating distribution to restaurants and institutions, where customers and inmates cannot easily, if at all, protest the serving of rotten tomato paste, unlike ordinary retail sales, where housewives do have some possible chance of protecting themselves against unwholesome products by buying first-grade articles at top prices.

■ Hence the district court was in error in its construction of the governing statute. There was further error in the holding that the government had a "very much heavier" burden of proof here than usual because of its first analysis which resulted in original clearance of the goods. D.C.E.D.N.Y., 111 F.Supp. 478, 480. We have held that in this class of cases the government has no extraordinary burden, but only the usual one of proof by a fair preponderance of the evidence. United States v. 5 Cases, More or Less, Containing "Figlia Mia Brand," 2 Cir., 179 F.2d 519, 524, certiorari denied Five Cases of Figlia Mia Brand of Oil v. United States, 339 U.S. 963, 70 S.Ct. 997, 94 L.Ed. 1372. Even if there were any basis for applying some rule of estoppel against government agencies in their enforcement of regulatory laws for the general welfare, there is nothing either in the grant of administrative favor or the then less compelling cast of the evidence —discussed below—to change this rule of law.

■ The order denying condemnation and releasing the goods to the claimant must therefore be reversed. And we think the state of the record is such that we should order judgment for the government, rather than remand for further trial. True, the district judge because of his rulings of law did not go on to make specific findings as to the degree of decomposition of the product. But the evidence was reasonably complete and upon it, taking it in favorable aspects to the claimant and even upon the testimony of his own expert, we think it clear, as a matter of law, that the product was adulterated within the statutory meaning. For a demonstration of this, some further analysis of the record is necessary.

It was agreed by both parties that the test to be employed was the Howard Mold Count as approved by the Association of Official Agricultural Chemists (Book of Methods of the Association of Official Agricultural Chemists, 7th Ed., § 35.64, p. 723). By this test a small amount of the duly mixed tomato paste is put upon a particular slide, the Howard mold count slide, for microscopic examination, the chemist in charge examining 25 fields of view on each slide and 4 slides or 100 fields (a minimum of 50 fields being required under the Howard count). The percentage number of microscopic fields in which mold filaments appear is therefore noted and deductions made as to the existence of mold signifying the use of tomatoes with rotted tissue. The government chemists worked with a tolerance of 40 per cent; that is, as one of the experts succinctly put it, "that the Administrator would not take action on products of this sort where the mould count did not exceed 40 per cent." [5] It will be noticed that under this test there is no direct gauge or measure of the amount of rot in particular samples, but rather of its prevalence throughout the various fields observed. As the expert testimony showed, under this method variations in result as among the different fields observed would be normal; the experts were looking for the number of fields showing mold filaments according to their prescribed standards, not the amount of mold in each—a point the district judge seems to have overlooked in stressing what he thought to be unusual discrepancy revealed as between the government

---

**5.** He went on to say: "However, a late announcement, in 1951, I think, indicated that other factors would be taken into consideration besides mould count in the seizing of goods."

chemists who testified. The tests reported seem to us therefore significant of the presence of rot in the product.

There was a total of 40 mold counts made on 30 cans of tomato paste from the seized shipment. Of those, 24 exceeded the administrative tolerance, as did the average of all mold counts, namely, 43.6%. The mold counts made by 4 government analysts on 18 different cans varied from a low of 8 to a high of 70, with the last average by Analyst Eisenberg being 56. Claimant's own expert found an average mold count, as he testified, of 39.7%; on a post-seizure sample of 10 cans he found that one-half of his counts exceeded the administrative tolerance. Further breakdown of the figures in the record is set forth in the footnote.[6] The claimant's expert himself answered "Yes" to the question: "On the basis of your counts would you draw the conclusion that there was rotten tissue in this tomato paste?" As indicated in the note, the sampling seems fair and to a considerable extent controlled by the claimant, particularly as to the final tests.

It is therefore clear that there was decomposed matter in all the samples, more substantially evidenced in some than in others, but enough to bring the average well over the administrative tolerance. We think violation of the statute therefore demonstrated, and the goods subject to forfeiture. If we accept the government's allowance of 40 per cent before prosecution is had, nevertheless the showing here is adequate to bring a very sub-

6. The following table shows the results of all the tests from the initial to the final ones:

### Government's Counts

| Import Sample | Seizure Sample Analyst Sly | Post Seizure Sample Analyst Krinitz | Post Seizure Sample Analyst Eisenberg |
|---|---|---|---|
| 8 | 42 | 42 | 60 |
| 38 | 33 | 46 | 60 |
| 38 | 61 | 57 | 56 |
| 30 | | 46 | 54 |
| 34 | | 38 | 58 |
| | | 48 | 70 |
| | | 55 | 54 |
| | | 27 | 44 |
| | | 61 | 60 |
| | | 12 | 44 |
| Av. 29.6% | Av. 45.3% | Av. 43.2% | Av. 56% |

### Claimant's Counts

| Post Seizure Sample—Analyst Chiano | | Import Sample |
|---|---|---|
| 42 | 42 | 38 |
| 50 | 37 | 33 |
| 49 | 24 | |
| 46 | 37 | |
| 38 | 32 | |

Av. 39.7%

This table, taken from appellant's brief and found to be correct on a check of the record and briefs, is slightly more inclusive and accurate than that set forth at 111 F.Supp. 479. It contains additionally the figures used by Analyst Sly, as well as those by claimant headed "Import Sample"; and it contains two variations, a substitution of 27 for 25 in one of the Krinitz counts, and of 42 for 30 in one of the Chiano counts, changing the averages for those counts from 43% and 38.5% to 43.2% and 39.7% as here correctly set forth.

The claimant actually controlled the sampling for the three final tests, since the government in every case selected a can next that chosen by claimant. The government in its samples ran two tests on each can, with the results indicated.

stantial portion of the shipment (undifferentiated from the entire mass) above that amount. It is doubtful, however, how far we may accept that tolerance. Here there is no definite provision for administrative setting of a tolerance, as under 21 U.S.C. § 346 for example. Though the Secretary under 21 U.S.C. § 336 would be justified in withholding prosecution, yet, when had, there would seem no authority for us to waive statutory violation perhaps beyond the principle of *de minimis*, as suggested in 67 Harv.L.Rev. 632, 645 supra. The question here involved is raised in United States v. 935 Cases, More or Less, Each Containing 6 No. 10 Cans of Tomato Puree, supra, D.C.N.D.Ohio, 65 F.Supp. 503, 505, where Judge Jones refers to the discretion given the Administrator not to report or prosecute minor violations and to make regulations of exemption or tolerance under 21 U.S.C. §§ 345, 346, but adds: "No such provision for regulation making exemptions, or for tolerating unavoidable ingredients is provided with respect to Section 342(a) (3)." This is the only case of the group cited above dealing with the present legislation (several of which were tried to the jury) where the question of a tolerance is even mentioned. But it accords with the view taken earlier, as in A. O. Andersen & Co. v. United States, 9 Cir., 284 F. 542, 545, quoted in note 1 supra.

Under either view, therefore, we think the shipment subject to condemnation. The order is accordingly reversed and the action remanded for the entry of a decree of condemnation.

FRANK, Circuit Judge (dissenting).

Fantis, the owner of this tomato paste, imported it under a contract which provided that he need not pay for it unless it was released from bond on its approval by the Food and Drug Administrator. On April 9, 1951, the Administrator (through a subordinate) having inspected it, gave Fantis the necessary approval. As a consequence, Fantis paid some $9,000 to the seller. Some three months later, the Administrator re-inspected the shipment, declared it in violation of the Act, seized it and, by this proceeding, sought a court order confiscating it. The Administrator having won in this court under my colleagues' decision, Fantis will lose his property without any compensation—*i.e.*, he will be out the $9,000.

1. The pertinent section of the Federal Food, Drug, and Cosmetic Act of 1938, is 21 U.S.C.A. § 342(a) (3), which authorizes condemnation (confiscation) of food as adulterated, "if it consists in whole or in part of any filthy, putrid, or decomposed substance, or if it is otherwise unfit for food". The words "filthy or putrid" have no relevance here, for the government does not charge that this tomato paste was either filthy or putrid. The government proved only that it contained some "decomposed substance"— namely mold. It did not prove, or even try to prove, that this food was either deleterious to health or "unfit for food". Indeed, the government and my colleagues assert that such proof was not necessary. For an understanding of my position, it is desirable to highlight these facts:

(a) The phrase "decomposed matter," as applied here, means simply and solely "mold."

(b) The government admits that no one looking at this tomato paste, or tasting or smelling it, would have any knowledge that it contained any mold. The government's experts testified, and the government's brief states, that the presence of such mold in tomato paste can be detected only through a microscope and by an expert.

(c) The evidence here discloses that virtually all tomato paste contains some mold.

(d) So the use of the word "rotten" (or of any other pejorative) indicates nothing in any way unpleasant or harmful but merely that the tomato paste contains some utterly harmless mold.

(e) As several kinds of cheese which thousands of our citizens consider delectable—*e.g.*, Roquefort or Gorgonzola— contain very substantial quantities of

mold, my colleagues' interpretation means that Congress authorized the Pure Food and Drug Administrator to condemn such cheese any time the Administrator happens to decide that it should not be sold.

(f) No one (including the government, except my colleagues in their opinion here) has ever so much as intimated that the presence of mold in a can indicates a possible future deterioration of the contents of the can which may later render the contents injurious to health. Indeed, in this very case a government expert witness testified that, in a properly made can, the amount of mold present in the can when it is sealed, will never increase; and there is no proof that the cans here were not properly made and sealed.[1]

1. See further discussion in point 3 of the Appendix to this opinion.

2. See Federal Security Administrator v. Quaker Oats Co., 318 U.S. 218, 230, 63 S.Ct. 589, 87 L.Ed. 724; United States v. Two Bags, etc., 6 Cir., 147 F.2d 123; cf. United States v. Antonio Corrao Corporation, 2 Cir., 185 F.2d 372.

3. Section 341 reads:
"Definitions and standards for food. Whenever in the judgment of the Secretary such action will promote honesty and fair dealing in the interest of consumers, he shall promulgate regulations fixing and establishing for any food, under its common or usual name so far as practicable, a reasonable definition and standard of identity, a reasonable standard of quality, and/or reasonable standards of fill of container: *Provided*, That no definition and standard of identity and no standard of quality shall be established for fresh or dried fruits, fresh or dried vegetables, or butter, except that definitions and standards of identity may be established for avocadoes, cantaloupes, citrus fruits, and melons. In prescribing any standard of fill of container, the Secretary shall give due consideration to the natural shrinkage in storage and in transit of fresh natural food and to need for the necessary packing and protective material. In the prescribing of any standard of quality for any canned fruit or canned vegetable, consideration shall be given and due allowance made for the differing characteristics of the several varieties of such fruit or vegetable. In prescribing a definition and standard of identity for any food or class of food in which optional ingredients are permitted,

(g) This suit is based upon alleged adulteration, under § 342(a) (3), not upon "economic adulteration,"[2] or misbranding, *i.e.*, not upon any misrepresentation of the contents of the can. The Administrator, to protect consumers, has the power, under § 341,[3] to issue regulations fixing reasonable standards of identity, quality and fill of containers, and has issued such regulations as to many foods.[4] He might have issued such a regulation relating to canned tomato paste, with specific reference to the percentage of mold. In that event, if the cans here had failed to meet that standard, there would have been misbranding under § 343(g) or (h),[5] and confiscation would have been justified. But no such regulation exists. (In its absence, it is

the Secretary shall, for the purpose of promoting honesty and fair dealing in the interest of consumers, designate the optional ingredients which shall be named on the label. Any definition and standard of identity prescribed by the Secretary for avocadoes, cantaloupes, citrus fruits, or melons shall relate only to maturity and to the effects of freezing."

4. See 67 Harv.L.Rev. (1954) at 660–661.

5. They read as follows:
§ 343. Misbranded food. * * *
"(g) If it purports to be or is represented as a food for which a definition and standard of identity has been prescribed by regulations as provided by section 341, unless (1) it conforms to such definition and standard, and (2) its label bears the name of the food specified in the definition and standard, and, insofar as may be required by such regulations, the common names of optional ingredients (other than spices, flavoring, and coloring) present in such food.
"(h) If it purports to be or is represented as (1) a food for which a standard of quality has been prescribed by regulations as provided by section 341, and its quality falls below such standard, unless its label bears, in such manner and form as such regulations specify, a statement that it falls below such standard; or (2) a food for which a standard or standards of fill of container have been prescribed by regulations as provided by section 341, and it falls below the standard of fill of container applicable thereto, unless its label bears, in such manner and form as such regulations specify, a statement that it falls below such standard."

difficult to understand just what my colleagues mean when they say that housewives buying canned tomato paste—as distinguished from consumers of tomato paste, like that here, destined for sale to restaurants or institutions—"do have some possible chance of protecting themselves against unwholesome products by buying first-grade articles at top prices." For, as above noted, no consumer is able to tell whether, or how much, mold is in a can of such paste.)

2. My colleagues construe "decomposed" as an absolute, *i.e.*, unqualified by the subsequent words "or otherwise unfit for food." In an Appendix to this opinion, I have stated my reasons for construing "decomposed" as meaning so decomposed as to be "unfit for food" but not so decomposed as to be deleterious to health. The record discloses not even a soupcon of evidence that this tomato paste, when seized, was unfit for food. Consequently, under my interpretation of § 342(a) (3), the district court's order should be affirmed.

3. However, under either interpretation, the Administrator has an amazingly wide and unregulated discretion (since, as my colleagues say, even "unfit for food" has a most latitudinarian meaning). So, according to my colleagues' view, if the Administrator, without any previous publication of a standard, chose to seize tomato paste containing but 5% of mold, the courts would have to enforce the seizure and confiscate the paste. This means the absence of any impediment to unequal treatment in the administration of the statute.

My colleagues, to be sure, point to 21 U.S.C.A. § 336 which reads, "Nothing in this chapter shall be construed as requiring the Secretary to report for prosecution, or for the institution of libel or injunction proceedings, minor violations of this chapter whenever he believes that the public interest will be adequately served by a suitable written notice or warning." But (aside from the fact that this section covers "minor violations" only) my colleagues themselves recognize

that it does not cut down the Administrator's immense power, even as to most "minor violations," but leaves it entirely in the Administrator's uncontrolled discretion to institute a proceeding to condemn any food containing mold: My colleagues explicitly rule that, once the Administrator has exercised his uncontrolled discretion and begun such a proceeding, the court must order the food condemned, no matter how small the amount or percentage of mold (unless perhaps it is so small as to come within the "de minimis" principle). It follows that § 336 does not in any way diminish the vast delegation of discretionary authority to the Administrator or preclude inequality in the exercise of that authority.

4. I am not now prepared to say that such statutory delegation, although (as my colleagues say) coupled with no recognizable standard whatever, is unconstitutional. But our responsibility goes beyond adjudication of the validity of the legislative grant. It includes the duty of scrutinizing the methods employed in the processes of administering the granted power. Unless this power is in some way constrained (as I believe it has been by the Administrative Procedure Act), it permits dangerous administrative arbitrariness: The Administrator may one day confiscate Smither's food product because it contains 10% of mold; the next day confiscate Williams' because it contains 15%; and the day after, Robinson's because it contains 40%.

The fact that the Administrator had in no such case previously announced a standard binding upon him would not (except as I shall note in a moment) invalidate his action. I stress this fact because, in answer to Fantis' complaint that he relied on the Administrator's initial approval, the government says that he had no business thus to rely but, before expending his $9,000, should have obtained the advice of an expert he might have hired. But, absent knowledge of some fixed standard, no expert could have given such advice.

No doubt to avoid this sort of situation, Congress, in the Administrative Procedure Act, required administrative officials to publish their standards. Section 3(a) (3) of that Act, 5 U.S.C.A. § 1002(a) (3), provides that "Every agency shall separately state and currently publish in the Federal Register * * * (3) substantive rules adopted as authorized by law and statements of general policy or interpretations formulated and adopted by the agency for the guidance of the public * * *." The Administrator's determination that food containing a certain percentage of mold is "decomposed" and therefore subject to condemnation under the Act, is both an interpretation of the Act and a statement of policy as to standards. As such, that determination should be published in the Federal Register in accordance with the provisions of § 3(a) (3). The necessity of apprising the public of administrative standards and interpretations was apparent to the drafters of the Administrative Procedure Act for, in a report dealing with § 3(a) (3), the House Committee stated:[6] "The section forbids secrecy of rules binding upon or applicable to the public or of delegations of authority. Mimeographed releases of many kinds now common should no longer be necessary since, if they contain really informative matter, they must be published as rules, policies, or interpretations. Substantive rules include the Statement of Standards." H.Rep. 1980 on S. 7—79th Cong. 2nd Sess. May 3, 1946.

The Administrator did not comply with this provision. Indeed, one of the government experts testified in this case that the Administrator, since the seizure here, has changed his standard;[7] but no standard whatever, relative to mold in tomato paste, has ever been published in the Federal Register.[8]

It may be noted that, in the trial court, Fantis' counsel stated that "it has been recognized by President Truman that various departments in our Government, in order to overcome the necessity of increasing tariff laws, or increasing tariff rates and duty rates, have found other ways of discouraging importers from importing merchandise, and it is acknowledged, and a committee was appointed by President Truman, and there have been articles on this in the New York Times, and it is a well known by-word in the trade that various departments of the Government find methods other than duty to restrict importers from importing certain types of merchandise." Fantis offered no proof to support such a conclusion. But, with utterly uncontrolled discretion, restricted by no announced and binding standards, such administrative behavior may occur. Compliance with the Administrative Procedure Act will help to prevent it. Publication of binding standards has another virtue: If a citizen thinks the published standard unreasonably low, he can complain, through his congressional representatives, and Congress may reduce the statutory discretion.

6. In the well-known Attorney General's report published before passage of the Act, the following statement concerning publication of rules was made: "Most agencies develop approaches to particular types of problems which, as they become established, are generally determinative of decisions. Even when their reflection in the actual determinations of an agency has lifted them to the stature of 'principles of decision,' they are rarely published as rules or regulations, though sometimes they are noted in annual reports or speeches or press releases, as well as in the opinions disposing of particular controversies. As soon as the 'policies' of an agency become sufficiently articulated to serve as real guides to agency officials in their treatment of concrete problems, that fact may advantageously be brought to public attention in a precise and regularized form." Report of the Attorney General's Committee on Administrative Procedure, 77th Cong., 1st Sess. (1941) Sen. Doc. No. 8.

7. See my colleagues' opinion, footnote 5.

8. Of course, the Administrator can validly change the standard—prospectively.

Unhampered discretion of the type conferred by 21 U.S.C.A. § 342(a) (3) is at best, insidious. Possessed of such power, an official may stop the sale of perfectly good food merely because he happens not to like it. (One recalls the tale of the totalitarian agitator who, having promised in a speech that, after the revolution, everybody would eat strawberries, replied to a heckler who loathed that fruit: "Comes the revolution, you'll eat strawberries.") More than a century ago, in 1840, Tocqueville warned that, even in a political democracy there might arise "an immense and tutelary power" which would be "absolute, minute, regular and mild," aiming to keep the citizens "in perpetual childhood." Such a government would seek "to spare them all the care of thinking and all the trouble of living. * * * It must not be forgotten that it is especially dangerous to enslave men in the minor details of life. * * * Subjection in minor affairs * * * does not drive men to resistance, but it crosses them at every turn, till they are ready to surrender the exercise of their own will. Thus their spirit is gradually broken and their character enervated. * * * "9

Such a possibility should cause courts like ours, when they can, to insist that administrative officers exercise wide discretionary powers in accordance with any statutory provision which requires that they commit themselves to properly publicized standards. In that way, to some extent at least, can there be reconciled unavoidable delegation of extensive discretion to administrators with needed protection of the individual.

Even assuming, then, the correctness of my colleagues' interpretation of the 1938 statute, I think we should affirm the order of the district court because of the lack of compliance with the Administrative Procedure Act.

**Appendix To Judge FRANK'S Dissenting Opinion**

1. I think the following history of 21 U.S.C.A. § 342(a) (3) teaches that it permits confiscation of food containing mold (*i.e.*, "decomposed" matter) only if the presence of the mold makes the confiscated article "unfit for food":

(a) Section 7 of the original Pure Food and Drug Act of 1906 (*i.e.*, former 21 U.S.C. § 8) provided that food should be deemed adulterated and subject to condemnation if, among other things, "it consists in whole or in part of a filthy, decomposed or putrid animal or vegetable substance, or any portion of an animal unfit for food, whether manufactured or not, or if it is the product of a diseased animal, or one that has died otherwise than by slaughter."

(b) My colleagues cite one Court of Appeals decision and five District Court cases which interpreted that provision of the 1906 Act. The Ninth Circuit held that the provision did not require proof that the food be injurious to health but did require proof that " 'the product is so far decomposed as to be unfit for food' " (or "unfit for human consumption"). See A. O. Andersen & Co. v. United States, 9 Cir., 1922, 284 F. 542, 544, 545. In so holding, the court cited and quoted from United States v. Two Hundred Cases of Catsup, D.C.Or.1914, 211 F. 780, and United States v. 133 Cases of Tomato Paste, D.C.E.D.Pa. 1938, 22 F.Supp. 515. Of the other three district court cases cited by my colleagues,10 only one said that neither harm to health nor "unfit for food" need be shown.11

(c) So the judicial interpretation stood when the 1938 statute, the Federal Food, Drug, and Cosmetic Act, was enacted. I think my preceding paragraph

---

**9.** Tocqueville, Democracy in America, Vol. II (1840) Fourth Book, Chapter VI.

**10.** Knapp v. Callaway, D.C.S.D.N.Y.1931, 52 F.2d 476, United States v. Krumm, D. C.E.D.Pa.1921, 269 F. 848, United States v. Two Hundred Cases, More or Less,

of Canned Salmon, D.C.S.D.Tex.1923, 289 F. 157.

**11.** United States v. Two Hundred Cases, More or Less, of Canned Salmon, D.C. S.D.Tex.1923, 289 F. 157.

shows that my colleagues mistakenly argue that the pre-1938 judicial decisions disclosed a "uniform construction" (sustaining my colleagues' view of former Section 7) of which Congress must have been aware when it legislated in 1938. The new Act amended the 1906 Act and added many wholly new provisions. In particular, it substituted for the portion of former Sec. 7, 21 U.S.C. § 8, new Sec. 342(a) (3) which provides that food is adulterated "if it consists in whole or in part of any * * * decomposed substance, or if it is *otherwise* unfit for food". The italicized word "otherwise" is new. I find it difficult to interpret it except as meaning that the existence of any "decomposed substance" does not render food "adulterated" unless the effect is to render the food "unfit for human food."

(d) So read, the 1938 amendment serves to make clear that the Ninth Circuit's interpretation of old Section 7 was correct. This explains what the Senate Report, quoted by my colleagues, meant in stating the provision of Subsection (a) (3)—of what became Sec. 342—was "essentially the same" as that in the 1906 Act.

(e) My colleagues mention the subsequent Committee Report which declared that " * * * the measure * * * amplifies and strengthens the provisions to safeguard the public health." The "measure," of course, was the entire new Act. Without doubt, that Act did amplify and strengthen the former health-safeguarding provisions. (In the footnote, I point to a few samples of that character.[12]) So that the Report cannot

reasonably be interpreted to justify a conclusion that Section 342(a) (3) departed from the Ninth Circuit's interpretation of Section 7 of the former Act.

2. My colleagues seem to suggest that §§ 71 to 91 of 21 U.S.C.A.—sections dealing with meat inspection—are inconsistent with my interpretation. As I understand my colleagues, they rely on those meat-inspection sections to show that, in talking of "decomposed substance" in former § 7 or in (new) § 342(a) (3), Congress could not have intended that the presence of such substance in food would authorize condemnation only if the result would render the food "unfit for food". Their discussion of this point is not entirely clear. They seem to imply that Section 342(a) (3) must be broadly construed so as not to conflict with the Meat Inspection Act.

But note this: The meat inspection provisions—Sections 71 to 91—constituted the Meat Inspection Act of 1907 [13] which was enacted separate and apart from the Food and Drugs Act of 1906,[14] so that meat which passed inspection under the Meat Inspection Act obviously could not be condemned under any section of the Pure Food and Drugs Act. This fact was made inescapably clear in the new Act—the Federal Food, Drug, and Cosmetics Act, enacted in 1938—the last section of which reads: "Meats and meat food products shall be exempt from the provisions of this Act to the extent of the application or the extension thereto of the Meat Inspection Act of March 4, 1907, as amended (U.S.C., 1934 ed., title 21, secs. 71–91; 34 Stat. 1260 et seq.)." [15] In line with the foregoing,

---

12. Section 333 increases the maximum penalties (a $100 fine and a one-year term of imprisonment) to $10,000 and three years' imprisonment. Section 332(b) provides for enforcement by injunction. Section 342(a) (4) and (6) adds new forbidden kinds of adulteration. See also Sec. 344 as to permits and inspections; many provisions of subchapter V relating to drugs, and subchapter VI covering adulterated cosmetics; and note Sections 372 and 374 as to examinations, investigations, and inspection, 373 as to

records of interstate shipments, and Section 375 as to publication of reports.

13. It was first enacted as part of an Act making appropriations for the Department of Agriculture in 1906, 34 Stat. 674, part of Chapter 3913, and later enacted as the Meat Inspection Act of 1907, 34 Stat. 1260, part of Chapter 2907.

14. See 34 Stat. 768, Chapter 3915.

15. See 52 Stat. 1059, being Sec. 902(b). It is now in the Code as 21 U.S.C.A. § 392.

enforcement of the Meat Inspection Act was left in the Department of Agriculture, while enforcement of the Food and Drugs Act was transferred first to the Federal Security Agency and more recently to the Department of Health, Education & Welfare.

3. My colleagues suggest that Congress, in Sec. 342(a) (3), intended to give the Administrator power to confiscate food containing mold, although in nowise unwholesome or "unfit for food", because Congress regarded mold in food as "a sign of danger"—presumably a sign that the food would probably soon become thus "unfit." To this suggestion I have these answers: There is not a word in the legislative history to support the notion that mold in food red-flags "danger to come," not a syllable of evidence of that sort in the record of this case, not the faintest hint of it in the government's brief; nor has any previous case in the books intimated that mold in food signalizes "danger to come." Moreover, as already noted, one of the government's expert witnesses testified in this case that, in the ordinary, properly made and sealed can, the amount of mold existent when the can was sealed would never increase. What is more, my colleagues maintain that the Administrator, in his unhampered discretion, may successfully cause the condemnation of food containing a very small amount or percentage of mold—so small that it is inconceivable it would signify future "danger."

4. My colleagues refer to the fact that the recently enacted Section 342(e), relative to oleomargarine, is worded like Section 342(a) (3), in that, after speaking of "decomposed substance," it goes on to speak of "or otherwise unfit for food." How this enactment supports my colleagues' construction of Section 342(a) (3) I do not comprehend.[16]

16. Nor do I understand their argument based on Sec. 351(a) which deals with adulterated drugs. For there Congress significantly did not use the phrase or "otherwise unfit for food". As Sec. 351 (a) is not here before us, I shall not here undertake to interpret it.