UNITED STATES of America,
Libelant,

v.

233 TINS, MORE OR LESS, of an Article Labeled in Part: "GROVE BRAND * * * WHOLE BLAKEMORE STRAWBERRIES, Net Weight 30 Lbs. Code 5258 Kelly Canning Co. Prairie Grove, Arkansas." Kelly Canning Company, Claimant.

Civ. A. No. 1465.

United States District Court
W. D. Arkansas,
Fort Smith Division.

Aug. 28, 1959.

Charles W. Atkinson, U. S. Atty., Robert E. Johnson, Asst. U. S. Atty., Ft. Smith, Ark., for libelant.

Wade & McAllister, Rex W. Perkins, Fayetteville, Ark., for claimant.

JOHN E. MILLER, Chief Judge.

### Statement

This is a seizure action brought under the provision of the Federal Food, Drug and Cosmetic Act, 21 U.S.C.A. § 301 et seq. The libel of information charges that the res, 233 tins of frozen strawberries, is "adulterated" within the meaning of 21 U.S.C.A. § 342(a) (3) while held for sale after shipment in interstate commerce. The adulteration charged is that it consists "wholly or in part of a decomposed substance by reason of the presence therein of rotten berries." The claimant, Kelly Canning Company, admits in its answer that the strawberries involved in this case were shipped in interstate commerce. It denies, however, that the frozen strawberries are adulterated as charged.

The strawberries in question comprise a portion of lot No. 5258 of the Kelly Canning Company of Prairie Grove, Arkansas. On May 27, 1958, the strawberries were quarantined by Arkansas state authorities while at the Rogers Ice and Cold Storage Company, Rogers, Arkansas. The strawberries are still at that location. However, from time to time various samples of the frozen fruit have been taken and examined.

At the conclusion of the trial to the court on July 1, 1959, the case was submitted and taken under advisement. Counsel for the parties were requested to submit briefs in support of their respective contentions. The briefs of the parties have been received, and have been considered with all of the testimony, a transcript of which was furnished to the court by the claimant, along with the exhibits thereto, and the court now makes and files herein its findings of fact and conclusions of law, separately stated.

### Findings of Fact

#### 1.

The libeled article of food, consisting of 233 tins labeled in part, "Grove Brand * * * Whole Blakemore Strawberries Net Weight 30 lbs. Code 5258 Kelly Canning Co., Prairie Grove, Arkansas," was shipped in interstate commerce on or about May 25, 1958, by the Adair County Commission Company from Stilwell, Oklahoma, to the Kelly Canning Company, Prairie Grove, Arkansas, where the berries were packed and subsequently shipped for freezing to the Rogers Ice and Cold Storage Company, Rogers, Arkansas. The code number "5258" was adopted to indicate that the berries were shipped to the claimant on the 25th day of the 5th month of the year 1958.

#### 2.

The Kelly Canning Company received the strawberries in question on May 26, 1958, and processed and packed them that evening. The processing and packing operation consisted of receiving, dumping, sorting, and washing the strawberries, and then adding sugar and placing them in 30-lb. tins. Sam Dickey, a sanitarian for the Arkansas State Board of Sanitation, observed the processing of lot No. 5258 at the Kelly Canning Company. Dickey reported to the owner of the cannery, John Kelly, that "questionable" strawberries were being packed. Following the processing operation in Prairie Grove, Arkansas, the strawberries were loaded on a truck and transported to the Rogers Ice and Cold Storage Company in Rogers, Arkansas. Dickey followed the truck to Rogers, and quarantined the 233 tins in lot No. 5258. The following day Mr. Dickey took samples of the berries he had quarantined and submitted them to the Arkansas State Board of Health.

### 3.

On June 23, 1958, Loren Gibson, agricultural grader for the U. S. Department of Agriculture, stationed in Fayetteville, Arkansas, took samples from 10 of the questioned tins located at the Rogers Ice and Cold Storage Company. Gibson chipped about 3 pounds from the top of the 10 tins and took the samples to his laboratory where he examined them. He checked 5 of the samples for "quality factors," color, firmness, and taste, and conducted a mold count on the remaining 5 samples, using the Howard method. This Howard test revealed a mold count range of 24 percent to 44 percent, with an average count of 32 percent. Gibson then certified the 10 tins which he had sampled, classifying 8 tins as U. S. Grade B and 2 tins as U. S. Grade C. The certificate issued by Gibson on June 23, 1958, was "reversed as to grade" by the Inspection Division of the Agricultural Marketing Service of the U. S. Department of Agriculture on January 21, 1959. The January 1959 certificate which reversed Gibson's June 1958 certificate bears the remark, "grade not certified account mold count of some samples slightly in excess of branch administrative guide." This occurred after the examination of post-seizure samples as set forth in finding No. 5.

### 4.

On August 26, 1958, Everett L. Atkinson, a food and drug inspector for the Federal Food and Drug Administration, stationed in Little Rock, Arkansas, took a core sample from 12 of the 233 tins in question and shipped the frozen samples in dry ice to the Division of Microbiology of the Food and Drug Administration in Washington, D. C. Four core samples were taken from each of the 12 tins.

The samples shipped by Atkinson were received in the Microbiology Division of the Food and Drug Administration in Washington, D. C., by Frank R. Smith, a microanalyst, who has held that position since 1937. The samples were hard frozen when received. Smith thawed the samples and examined them for decomposition using the Howard Mold Count Method. By this test the strawberries are pulped, mixed thoroughly, and several tablespoonfuls are taken out for microscopic examination. The microscope is set at 100 magnification, and the pulp is placed on a special microscope slide. The chemist in charge examines 25 tiny fields of view on each slide, and two slides are examined for each sample. The count of positive fields is noted, and the percentage of mold in the sample is calculated. To constitute a positive field, there must be sufficient mold to extend across 1/6th of the diameter of a field. Smith's examination revealed a mold count for the 12 samples ranging from 54 percent to 82 percent, with an average count of 67.9 percent.

After making his examination, Smith placed a portion of each sample in a small bottle containing formaldehyde, so as to check the growth of any mold or any other decomposition in the berries, and delivered the 12 samples to Fred Dunn, the Head of the Inspection Branch of the Fruit and Vegetable Division of the Agricultural Marketing Service, U. S. Department of Agriculture.

Upon receipt of the samples Dunn examined them for mold, using the Howard Mold Count Method described above. His examination revealed a mold count range of from 43 percent to 80 percent, with an average count of 69.2 percent.

### 5.

On January 13, 1959, in response to an order from this court, a post-seizure sample was taken from the questioned 233 tins of lot 5258 by Everett L. Atkinson of the Little Rock office of the Food and Drug Administration, and Loren Gibson of Fayetteville, Arkansas, referred to in finding of fact No. 3, a grader for the Agricultural Marketing Service of the U. S. Department of Agriculture. Samples were taken from 13 of the 233 tins. Core samples were taken as in the first instance, and in addition about 3 pounds of the top of each sample can was chipped out. The

samples were marked, packed in dry ice, and shipped to the Food and Drug Administration in Washington, D. C. One of the 13 samples taken was from the same tin that had been sampled in August of 1958. The other 12 samples were from different tins.

These samples were received in a hard frozen condition in Washington. The Food and Drug Administration retained the "core" samples and delivered the chipped samples to the Agricultural Marketing Service.

The even-numbered core samples were examined for mold by Frank R. Smith and the odd-numbered core samples were examined by W. G. Helsel, a long-time microanalyst in this Division. The Howard Mold Count Method was used in these examinations. The even-numbered samples examined by Smith had a mold count range of from 50 percent to 84 percent, with an average mold count of 68.8 percent. The odd-numbered samples examined by Helsel had a range of 34 percent to 94 percent, with an average mold count of 71.5 percent. Following the examination of these "core" samples, a portion of each sample bottled in formaldehyde was delivered to Fred Dunn of the Agricultural Marketing Service where another Howard Mold Count was taken and revealed a range of 42 percent to 90 percent, with an average mold count of 71.7 percent.

The chipped-out samples, which were delivered directly to the Agricultural Marketing Service, were examined for mold, using the same Howard method by Fred Dunn. His examination reflected a range of 42 percent to 70 percent, with an average mold count of 57.9 percent.

**6.**

The Federal Food and Drug Administration has not established any tolerance as to the percentage of mold count in strawberries which would render them "adulterated" or "not fit for human consumption" within the meaning of the Food, Drug and Cosmetic Act.

The U. S. Department of Agriculture has issued an administrative guide to their graders in the field that they may certify strawberries which do not exceed an average count of 50 percent with none running higher than 60 percent, based on the Howard Mold Count Method.

**7.**

The strawberries packed in the 233 tins of lot 5258 in question here reflected an average mold count, using the Howard Mold Count Method, of between 60 and 70 percent with some samples ranging between 80 and 90 percent. The tests were made from samples which were taken at random from the entire shipment and which were reasonably representative of the lot.

Mold in strawberries indicates decomposition. The Howard Mold Count Method, which has been adopted by the Association of Official Agricultural Chemists, reflects the amount of mold in the strawberries.

**8.**

The testimony of the two expert witnesses, Smith and Helsel, of the Food and Drug Administration, and of Fred Dunn, Head of the Inspection Branch of the Fruit and Vegetable Division of the Agricultural Marketing Service, U. S. Department of Agriculture, convinces the court that a high mold count indicates that there is a large amount of rot or decomposed matter present in the berries.

### Discussion

Section 402(a) (3) of the Federal Food, Drug and Cosmetic Act, 21 U. S.C.A. § 342(a) (3), provides that a food shall be deemed to be adulterated "if it consists in whole or in part of any filthy, putrid, or decomposed substance, or if it is otherwise unfit for food." The act must be interpreted liberally in the interest of the Congressional purpose to prohibit the transportation of adulterated foods in interstate commerce. United States v. 935 Cases, more or less, etc., of Tomato Puree, D.C.N.D.Ohio 1946, 65 F. Supp. 503.

■ In the past it has frequently been argued that the phrase "if it is otherwise unfit for food" qualifies the preceding part of the sentence, and means in effect that the product must not only be decomposed, but must be decomposed to the extent of being unfit for food. The courts have just as frequently held, however, that the statute means that food which contains, filthy, putrid, or decomposed matter is to be deemed adulterated whether or not it is fit for food. Salamonie Packing Co. v. United States, 8 Cir., 1948, 165 F.2d 205, certiorari denied 1948, 333 U.S. 863, 68 S.Ct. 744, 92 L. Ed. 1142; Bruce's Juices, Inc. v. United States, 5 Cir., 1952, 194 F.2d 935; United States v. 449 Cases, Containing Tomato Paste, 2 Cir., 1954, 212 F.2d 567, 45 A.L.R.2d 846. In Salamonie Packing Co. v. United States, supra, the Court of Appeals for this Circuit stated at page 206 of 165 F.2d:

"We think that the court in that case has fully demonstrated that the statute means that food which contains filthy, putrid, or decomposed matter is to be deemed adulterated, whether or not it is fit for food. Apparently, for years, food processors have been endeavoring, unsuccessfully, to secure a ruling which would compel the Government, in cases such as this, to prove that an accused article of food contained so much decomposed matter as to make it unfit for human consumption."

■ Therefore, the only question to be determined in this case is whether the 233 tins of strawberries contained decomposed matter. The burden of proof in this case was upon the Government to prove by a preponderance of the evidence that the strawberries in question did contain in whole or in part a decomposed substance. In this class of cases the Government has no extraordinary burden but only the usual one of proving its case by a fair preponderance of the evidence. United States v. 449 Cases, Containing Tomato Paste, supra.

The claimant has argued very earnestly and ably in his brief that since strawberries do not have a strong protective coating, and that since the surface of the fruit is moist, it is much easier for mold filaments to germinate and survive on the surface of strawberries without actually penetrating the flesh of the berries than on the surface of other fruit. The claimant contends that the mold detected here was only on the surface of the strawberries. However, W. G. Helsel, a microanalyst for the Food and Drug Administration for 21 years, and who was instructed in the use of the Howard method by its originator, testified:

"Q. Have you had, in your experience, occasion to examine field laboratory conditions and make field tests with respect to frozen strawberries? A. Yes, I have.

"Q. And have you made tests on strawberries which you have observed in the field to determine what their condition is and what the resulting conditions are from the conditions which you observed in the field? A. Yes, I have.

"Q. With respect to strawberries containing rot, what would you expect to find if those strawberries were packed—properly packed for sweetened frozen strawberries? A. If they were properly packed I would expect to find a very low mold count and very little rot in the strawberries.

"Q. Would the percentage of mold count which you would expect to find have any relation to the number of rotten berries that were packed in a particular container? A. Yes, it would.

"Q. Would that be a direct mathematical relation? A. Well, there could be some variation, depending upon the size of the rot spots on the berries and the type of rot involved, but in general it is a close correlation between the amount of rot in the strawberries and the mold count.

"Q. Now, the mold that you find in the strawberries, that is, processed strawberries such as the 233 cans of strawberries which were seized in this case, what does that come from, what does that mold derive from? A. The mold comes from the rot in the strawberries themselves, from the rotten tissues.

"Q. Are there other kinds of molds which might be present on the particular strawberry, either at the time it was packed or after it was processed? A. Other kinds of mold?

"Q. Yes. That wouldn't be the result of rotten berries? A. Well, any mold in the strawberry tissue would be an indication that there was some rot present, and you can have mold spores on the surface of the strawberry, but if your mold spore or if the mold filament had not penetrated the berry tissue as such, you will not have rot, but merely the presence of mold spores which you have in the air, which you are likely to have on most anything that is exposed to the air.

"Q. Would I be correct in assuming that if you merely had the mold spores on the surface of the strawberries which had not penetrated the berry, that you would not have a percentage of mold count disclosed by an examination under the Howard Mold Count Method? A. That is right. The mold spores would not enter into the mold count.

"Q. Have you ever personally examined any strawberries that had a zero mold count? A. Yes, I have.

"Q. Based on your knowledge and experience, Mr. Helsel, does the mold count which you were able to determine in processed strawberries by the Howard Mold Count Method, accurately reflect the amount of rot or decomposition in the strawberries themselves? A. Yes, it does."

The Howard Mold Count Method has been approved by the Association of Official Agricultural Chemists (Book of Methods of the Association of Official Agricultural Chemists, 7 Ed., Sec. 35.64, p. 723). In discussing the use of this test in determining the existence of decomposed matter in tomatoes, the court in United States v. 1,500 Cases more or less, Tomato Paste, 7 Cir., 1956, 236 F. 2d 208, at pages 211–212 said:

"A tomato containing rot is simply a tomato parts of which have begun to decompose. This is not at all uncommon and such fruits are perfectly good if all of the decomposed portions can be cut out. Several different things cause tomatoes to decompose but by far the most common cause is mold. Because of this fact there has been developed a technique known as the Howard Mold Count which purports to estimate the amount of decomposition or rotting that has gone on in the tomatoes from which paste or juice has been made by measuring the amount of mold present in the finished product. The presence of mold proves that some rotting has taken place, but the absence of mold does not prove that no rotting has occurred. Add to this the fact that the Howard Mold Count system is susceptible to a fair degree of error in determining the amount of mold in a substance, and we have a rather inadequate method of measuring the amount of decomposition. Nevertheless, it seems to be the only practical method known at the present time, and has received the approval of both the Government and the food industry."

The claimant introduced testimony as to the color, firmness, taste, and general condition of the strawberries in question in an effort to establish that the berries were fit for food. One of the tins and its contents were exhibited to the court, and to a layman the berries did appear to be not only fit for food but had every appearance of being palatable. However,

the conclusion that the court has reached makes it unnecessary to determine whether the berries were and are fit for food.

In United States v. 935 Cases, more or less, etc., of Tomato Puree, D.C.N.D. Ohio 1946, 65 F.Supp. 503, the court on page 505 of its opinion said:

"Nor am I impressed with the testimony that the variable sense of smell and taste is more dependable in detecting rot than the microscopic procedure adopted by the Government. Certainly the question of adulteration would rest upon tenuous ground if reliance or conclusion as to the character of the product shipped were bottomed upon conflicting evidence as to the smell or taste of the article sought to be condemned.

"It is probably true that there will be a difference of opinion even under the microscopic procedure but for the want of a more reliable test it seems reasonable to accept such results depending, of course, upon the Court's conclusion as to the credibility of the witnesses testifying and giving their opinions upon that subject."

The language of the Act is very broad, and provides that a food shall be deemed to be adulterated "if it consists in whole or in part of any filthy, putrid, or decomposed substance, or if it is otherwise unfit for food." In commenting on this aspect of the Act in United States v. 449 Cases, Containing Tomato Paste, supra, the court at pages 572–573 of 212 F.2d said:

"It is of course true, as is often pointed out, e. g., 67 Harv.L.Rev. 632, at 644, 696, that the power granted is very broad, and 'literal application of the statute could lead to unjustified harshness.' But Congress has attempted to meet this difficulty by granting a large measure of discretion to the administrator, originally the Secretary of Agriculture, later the Federal Security Administrator, and now the Secretary of Health, Education and Welfare. In addition to provisions not here immediately pertinent for regulations making certain exemptions or granting certain tolerances, 21 U. S.C. §§ 345, 346, there is a significant provision in the chapter authorizing penalties, injunctions, and seizures that nothing therein 'shall be construed as requiring the Secretary -to report for prosecution, or for the institution of libel or injunction proceedings, minor violations of this chapter whenever he believes that the public interest will be adequately served by a suitable written notice or warning.' 21 U.S.C. § 336. Obviously the Congress considered such administrative control a wiser course than the hedging of power by various theoretical restrictions, the negativing of which might be difficult of proof in a particular case. And its wisdom is indicated in this very case, where the product is prepared for and sold in quantity distribution, in cans of 'Net Contents, 10 Lbs. About' of concentrated paste, thus indicating distribution to restaurants and institutions, where customers and inmates cannot easily, if at all, protest the serving of rotten tomato paste, unlike ordinary retail sales, where housewives do have some possible chance of protecting themselves against unwholesome products by buying first-grade articles at top prices."

It should be noted that the strawberries in question here are packed in 30-lb. tins, which would indicate that they, like the tomato paste referred to above, were not for ordinary retail sale.

The testimony of the expert witnesses has convinced the court that the average mold count in the strawberries was from 60 to 70 percent. All of the Government's experts testified as to the relationship between a high mold count and a high percentage of rotten berries. Even the claimant's witness, Gibson, the

grader for the U. S. Department of Agriculture, testified:

"Q. What I am getting at, Mr. Gibson, actually, in your grading you pay very little attention to the fact that there is a high mold count in the berries that you inspect, don't you? You are not required to by your service, are you? A. We are required to. That is one of our requirements before we certify. If we find a high mold count we won't certify it.

"Q. What is a high mold count? A. We have been administratively guided from our Washington department that if the mold count exceeds an average of fifty percent positive fields, with none running higher than sixty, we will certify it as to one of these three grades I have described."

■ The able attorneys for the claimant have strongly urged that it is virtually impossible to process strawberries without including some mold which would be reflected by the Howard Mold Count. It is probably true that a scientist with a microscope could detect mold or filth in almost any processed food substance. The question, therefore, is how much mold is required to make strawberries adulterated within the meaning of the Act. The Food and Drug Administration has not established any tolerance for strawberries, and there seems to be no definite provision for administrative setting of a tolerance, as under 21 U.S.C. A. § 346 for example. Though the Secretary under 21 U.S.C.A. § 336 is authorized in a proper case to withhold prosecution, yet, when a prosecution is instituted there does not seem to be any authority for a court to waive statutory violations perhaps beyond the principle of de minimis, as suggested in 67 Harv. L.Rev. 632, 645.

In United States v. 935 Cases, more or less, etc., of Tomato Puree, supra, Judge Jones referred to the discretion given the administrator not to report or prosecute minor violations and to make regulations of exemption or tolerance under 21 U.S.C. A. §§ 345 and 346, but adds at page 505 of 65 F.Supp.:

"No such provision for regulation making exemptions, or for tolerating unavoidable ingredients is provided with respect to Section 342(a) (3)."

■ A mold count of 60 to 70 percent on the average cannot be considered infinitesimal or inconsequential so as to allow the court to apply the rule of de minimis. This is a "high count" according to all the experts who testified.

■ The claimant's loss is considerable. The record discloses a conflict between the scientists of the Food and Drug Administration and the claimant's witness, Gibson, a grader for the U. S. Department of Agriculture, but the court feels compelled under the law and the statute as enacted to accept the testimony of the experts of the Food and Drug Administration. It is probably true that the statute under consideration is too broad and should provide a guide to processors of strawberries and other kindred foods in order to more accurately determine when a food is adulterated. If the statute is too broad and it needs amending in the public interest to guard against the possibility of the destruction of wholesome food by the Government, the remedy is to call the matter to the attention of Congress. Salamonie Packing Co. v. United States, supra.

■ Therefore, the court concludes that under the facts disclosed by the testimony, the 233 thirty-pound tins of frozen strawberries under seizure herein consisted in whole or in part of some filthy, putrid, or decomposed substance, and should be condemned and destroyed as required by the Act.

Conclusions of Law

1.

The court has jurisdiction of the subject matter and the parties hereto under 21 U.S.C.A. § 332.

2.

The 233 tins of strawberries labeled in part, "Grove Brand * * * Whole

Blakemore Strawberries, Net Weight 30 lbs., Code 5258, Kelly Canning Company, Prairie Grove, Arkansas," are adulterated within the meaning of the Act and should be condemned and destroyed as provided in the Act.

An order in accordance herewith is being entered today.