**MILLET, PIT AND SEED COMPANY, INC.**

v.

**UNITED STATES of America et al.**

**UNITED STATES of America**

v.

**An ARTICLE OF FOOD AND DRUG, etc.**

Civ. Nos. 3–77–172, 3–77–180.

United States District Court, E. D. Tennessee, N. D.

May 30, 1977.

W. P. Boone Dougherty, Robert W. Ritchie, Knoxville, Tenn., for plaintiff.

John L. Bowers, Jr., U. S. Atty., Knoxville, Tenn., Paul Ragan, Rockville, Md., Douglas E. Jones, Staff Atty., Dept. of Agriculture of Tennessee, Nashville, Tenn., for defendants.

## MEMORANDUM

ROBERT L. TAYLOR, District Judge.

We have for consideration two suits, the first of which is styled *Millet, Pit and Seed Company, Inc. v. United States of America, et al,* Civ. 3–77–172. In that case the State of Tennessee embargoed or tagged a number of cases of apricot kernels belonging to plaintiff, Millet, Pit and Seed Company, and valued at approximately $164,000.00. Douglas Heinsohn, who is the principal owner of the seed company, filed a complaint on May 6, 1977 against the United States, Secretary of Health, Education and Welfare, Califano, other agents of the United States, Robert Reeves and Roy G. Stipe (who are both agents of the State of Tennessee), and the State of Tennessee.

It is alleged that on April 15, 1977, the defendants, acting under color of state statutes and regulations and participating in a conspiracy, embargoed and seized a quantity of apricot kernels owned by Douglas L. Heinsohn (the complaint was later amended to name Millet, Pit and Seed Company as the plaintiff), without legal justification and in violation of the Fourth, Fifth and Fourteenth Amendments to the Federal Constitution, the Federal Food, Drug and Cosmetic Act, and in violation of Title 42 U.S.C. § 1983.

More specifically, it is alleged that on the above mentioned date, Norman Miller, an investigator for the Federal Food and Drug Administration, and Roy G. Stipe, an agent for the Department of Agriculture, Food and Drug Division of the State of Tennessee, acting in concert with the defendants Reeves, Jancarek, and certain other defendants who are federal employees, visited the Munford Refrigerated Warehouse and embargoed and detained 6,701 cartons of apricot kernels owned by the plaintiff and stored in the warehouse.

It is further alleged that the defendant Stipe, pursuant to the authority and direction of Reeves, and without complying with the provisions of the Tennessee Food, Drug and Cosmetic Act, turned the further enforcement action over to defendant Miller, acting pursuant to the authority and direction of Jancarek, all of which enforcement action was under color of state law, namely, T.C.A. § 52–101, et seq., and more particularly, T.C.A. § 52–106.

It is the plaintiff's theory that all of the actions of the defendants were under color of state law and the rules and regulations of the Department of Agriculture, Food and Drug Division, State of Tennessee, and were part of a conspiracy and subterfuge by the defendants to circumvent and evade applicable federal law, to-wit, the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 301 et seq. It is alleged that such actions were unlawful because the apricot kernels were seized and detained in the absence of a finding of or having probable cause to believe that the kernels were adulterated, as required by T.C.A. § 52–106. Plaintiff claims he has sustained serious and extensive damages on account of the seizure, and seeks damages in the sum of $1,000,000.00.

Plaintiff sought a hearing in the matter as expeditiously as possible requiring the defendants to show cause why they should not release plaintiff's property, and following the hearing, the issuance of an injunction requiring the defendants to release to plaintiff the apricot kernels.

The Federal Government has moved to dismiss the complaint because, after this suit was instituted, the Federal Government seized the kernels pursuant to a libel proceeding filed on May 12, 1977 under the Federal Food, Drug and Cosmetic Act. Thus, the United States argues that any challenge to the Federal Government's seizure must be litigated in the pending libel proceedings and that equitable relief is not appropriate due to the pendency of such proceedings.

The State of Tennessee, Reeves and Stipe have likewise moved to dismiss on the ground that the Court lacks jurisdiction because plaintiff has not availed itself of the method of review provided in T.C.A. § 27–901 et seq. They further assert that the relief sought by the plaintiff concerning the return of the kernels is a moot issue since the kernels are currently under seizure of

the federal marshals. Finally, the State of Tennessee correctly asserts that it is not a person under 42 U.S.C. § 1983.

The second suit is that of the *United States v. An Article of Food and Drug, etc.,* Civ. 3–77–180, in which the aforementioned apricot kernels were seized, on May 12, 1977, by the federal marshals under authority of an arrest warrant signed by the Clerk of this Court, issued pursuant to a libel for forfeiture under the Federal Food, Drug and Cosmetic Act (the Act), 21 U.S.C. § 301 *et seq.,* filed by the United States Attorney for this District. Millet, Pit and Seed Company, Inc. has intervened in this proceeding and filed a claim to said kernels.

A motion for summary judgment has been made by the claimant, Millet, Pit and Seed Company, based upon the theory that: (1) claimant sold the kernels as a food and not a drug, therefore the drug provisions of the Act are not applicable; (2) the kernels are not poisonous within the meaning of the Act; and (3) the kernels are not unfit for food.[1] It is ORDERED that the motion for summary judgment be, and the same hereby is, denied, because obviously there are material facts in dispute. We now consider each case on its merits.

## I. *Condemnation Case (3–77–180)*

### A. *Government's Claim That Kernels Are an Adulterated Food.*

The United States first alleges that the seized apricot kernels are subject to condemnation because they constitute an "adulterated food" within the meaning of the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 301 *et seq.* The charge that the kernels are an adulterated food is based on two separate provisions of the Act. Section 342 contains many definitions of adulterated food, including the two provisions at issue here.

The first provision relied on by the Government defines a food as being adulterated:

"If it bears or contains any poisonous or deleterious substance which may render it injurious to health; but in case the *substance* is not an added substance such food shall not be considered adulterated under this clause if the quantity of such substance in such food does not *ordinarily* render it injurious to health". (emphasis added). 21 U.S.C. § 342(a)(1).

The second provision relied on by the Government defines a food as being adulterated:

". . . if it is otherwise unfit for food." 21 U.S.C. § 342(a)(3).

As to the first provision, the Court finds that the potentially poisonous substance (amygdalin) found in these apricot kernels is not an "added substance" within the meaning of the Act.[2]

The test for determining whether a substance is an added substance is whether it occurs naturally in the food. *See United States v. An Article of Food, etc.,* 395 F.Supp. 1184 (S.D.N.Y.1975). It is obvious from the evidence presented to the Court that the potentially poisonous substance in apricot kernels (amygdalin) occurs naturally in the kernels. Therefore, the United States must prove that the kernels contain a quantity of the poisonous substance sufficient to render them injurious to health under *ordinary* conditions and usage.

Based on the testimony of expert witnesses presented by both the Government and the claimant, the Court is of the opinion that apricot kernels do not contain sufficient amounts of poisonous substance that might render them ordinarily injurious to health. The evidence demonstrates that ordinary use of these kernels as a food

---

1. Claimant has also filed a motion to dismiss the complaint upon the technical ground that the complaint in this cause was not verified on oath. The Sixth Circuit Court of Appeals has held that verification is not necessary. *United States v. 935 cases, etc.,* 136 F.2d 523 (6th Cir. 1943).

2. The Government charges that the kernels are poisonous because amygdalin contains cyanide which, if exposed to enzymes, releases a toxic gas known as hydrocyanic acid.

would not be injurious to the health of the consumer.

The Supreme Court, in an opinion rendered in 1914, quoted one of the Congressional sponsors of the original Food and Drugs Act of 1906, a predecessor of the Act involved here, as follows:

"As to the use of the term 'poisonous,' let me state that everything which contains poison is not poison. It depends on the quantity and the combination. A very large majority of the things consumed by the human family contain, under analysis, some kind of poison, but it depends upon the combination, the chemical relation which it bears to the body in which it exists as to whether or not it is dangerous to take into the human system." *United States v. Lexington Mill Co.*, 232 U.S. 399, 412, 34 S.Ct. 337, 341, 58 L.Ed. 658 (1914).

We have such a substance here. Amygdalin occurs naturally in approximately twelve-hundred different fruits, vegetables, grains and seeds, including strawberries, lima beans, barley, rye, apple seeds, peach kernels and cherry pits. So far as the Court has been advised, none of these substances has been condemned by the FDA as being adulterated solely by reason of its amygdalin content.

Most substances, if consumed in excessive quantities, will produce some adverse effects in some individuals. One highly qualified government witness testified that excessive quantities of common table salt can produce consequences harmful to the ordinary person. The Government has produced evidence which tends to establish that the ingestion of excessive quantities of apricot kernels may produce headaches and nausea in some individuals, particularly those who are weakened by disease.[3] Claimant has introduced persuasive evidence to the contrary, including the testimony of a medical doctor who, in an experiment, ingested one-half pound (approximately 400) of the unpleasant tasting kernels in one day without suffering adverse effects.

Be that as it may, we are concerned here with ordinary usage under ordinary conditions. Having considered the evidence of record, the Court finds that the amygdalin content of apricot kernels is not sufficiently great to render the kernels injurious to health under ordinary conditions and usage. Accordingly, the kernels cannot be condemned as an adulterated food on the alleged ground that they may be injurious and poisonous within the meaning of the Act.

▄▄ As to the Government's second ground for condemning the kernels as an adulterated food, the Government has produced little evidence which would tend to establish that these kernels are "unfit for food." This provision is a separate and independent basis for a finding that a food is adulterated. *See United States v. 484 Bags, etc.*, 423 F.2d 839 (5th Cir. 1970). A finding of unfitness for food must be based on proof that, although the food item did not meet the other definitions of an adulterated food, it was "*otherwise* unfit for food." Such a finding can be made only when the proof demonstrates that the article of food was inedible for the average person under ordinary conditions. *See United States v. 24 Cases, etc.*, 87 F.Supp. 826 (D.Me.1949). The Government has failed to prove that the kernels are unfit for food as contemplated by the Act.

The Court finds that the seized kernels are not an adulterated food within the meaning of the Act and cannot be condemned on that ground. However, this does not end our inquiry, as the United States also charges in the libel of information that the kernels are "drugs" as that term is defined in the Act, and that the kernels fail to meet the labeling requirements imposed on drugs under the Act.

---

3. The Government contends that the Court must limit its inquiry into the class of potential users to cancer victims, and asserts that cancer victims are more susceptible to toxicity than healthy persons. The proof shows, however, that a large proportion of those who consume apricot kernels are healthy persons.

B. *Are the Kernels Drugs?*

The term "drug" is defined in 21 U.S.C. § 321(g)(1) as including:

"[A]rticles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals . . . ."

The courts have held that it is the *intended use* which determines whether or not an article is a drug. *E. g., Rutherford v. United States,* 542 F.2d 1137 (10th Cir. 1976); *United States v. An Article . . . Sudden Change,* 409 F.2d 734 (2d Cir. 1969); *Hanson v. United States,* 417 F.Supp. 30 (D.Minn.1976). The Sixth Circuit Court of Appeals has held that ordinary honey must be classified as a drug when it is sold for therapeutic purposes. *United States v. 250 Jars, etc.,* 344 F.2d 288 (1965).

▮ In determining the intended use of a given article, the Court must seek to ascertain the intent of the claimant by looking to all the facts and circumstances shown at trial. The cases emphasize that, in determining the intent of a claimant engaged in the distribution of the article, the Court should consider not only the claimant's own assertions, but also the "label, accompanying label, promotional claims, advertising, and any other relevant source." *Hanson v. United States, supra* at 35. Statements made by a claimant through virtually any medium are relevant to this inquiry. *See United States v. An Article . . . Sudden Change, supra.*

▮ Only one claimant has intervened in these proceedings, Millet, Pit and Seed Company. The proof shows that it is a corporation managed and owned solely by Heinsohn. Accordingly, the Court considers the intent manifested by Heinsohn to be highly relevant to these proceedings. Hein-

sohn testified that he sold the apricot kernels solely as a food supplement.[4] His testimony was positive and unequivocal on the issue of the intended use of the articles. He swore that he made no representations to his customers regarding the efficacy of apricot kernels as a treatment or cure for cancer or any other disease. He sold the kernels in bags labeled: "Millet, Pit & Seed Co. Natural* APRICOT KERNELS. NOT LESS THAN ONE POUND AT TIME OF PACKAGING. HOT AIR DRIED TO REMOVE EXCESS MOISTURE. . . . * NO ADDITIVES."

▮ The Court has considered the documentary evidence introduced by the Government to establish that the claimant, in fact, intended that the apricot kernels be used for the prevention and treatment of a disease and is thus a drug. The first document is a letter from Heinsohn dated December 2, 1974 and printed on Millet, Pit and Seed Company stationery. It contains the salutory greeting "Dear Friend." Almost the entire letter refers to peach kernels, and only one sentence mentions apricot kernels. The letter states, in substance, that one scientist believes that the ingestion of eight to twelve peach kernels per day can prevent malignancies from becoming clinical, and that peach kernels could be purchased from the claimant. The letter does not state that the claimant had apricot kernels for sale or would ever have any for sale.

The second document is a letter dated January 5, 1975 and addressed to Heinsohn and the Millet, Pit and Seed Company. The letter was sent by the scientist referred to above, who in this letter evaluated the amygdalin content of the peach kernels being sold by the claimant. Only one remark in

4. The proof showed that some persons consume apricot kernels out of the belief that the kernels serve to prevent cancer. However, Heinsohn testified that he makes no attempt to ascertain what consumers of his kernels plan to use them for, because he considers such information to be the consumer's "business". While the seller's knowledge of the consumers' uses for his product is a factor to be considered, we do not agree with the apparent theory of the government that if *any* consumers use a product as a drug, such use, if known by the seller, is determinative on this issue. Carried to its logical extreme, this would mean that every merchant who sells carrots to the public with knowledge that some of his consumers believe that the ingestion of carrots prevents eye diseases holds the carrots out for use as a drug, as that term is defined in the Act.

the letter contains any mention of apricot kernels; the apricot kernels were referred to solely as a reference point for evaluating the amygdalin content of peach kernels.

The third document is a leaflet dated June 6, 1975 and printed on Millet, Pit and Seed Company stationery. The leaflet deals primarily with peach kernels and their alleged value in the prevention of cancer, and repeats the references made in the first two documents to apricot kernels. One additional comment is made to the effect that the FDA has banned the retail sale of apricot kernels but has not banned the retail sale of peach kernels.

Each of the above documents focuses upon peach kernels, which contain approximately the same amount of amygdalin as apricot kernels. Although the Government seeks to equate peach kernels with apricot kernels, there is no evidence that the FDA has ever made any attempt to condemn peach kernels sold by Heinsohn or anyone else. The proof shows that agents of the FDA inspected the premises of Millet, Pit and Seed Company over two years ago, and Heinsohn was most cooperative in showing them his stock of peach kernels and some of the above documents. He asked the agents if there was anything wrong with the sale of peach kernels, and the agents replied that they did not believe so, but would advise him should they change their minds. With the exception of several unknowing encounters with FDA undercover agents, Heinsohn had no further contact with the FDA until the apricot kernels at issue were seized.

The above documents[5] fail even to intimate that Heinsohn had apricot kernels for sale. They were written approximately two years before he began to sell apricot kernels. This circumstantial evidence on the issue of intended use does not outweigh the positive sworn testimony of Heinsohn and the other evidence of record that he did not hold the apricot kernels out as a substance to be used in the prevention and treatment of cancer. An additional factor in support of this holding is the wholly natural state of the seized articles and the appearance of their packaging. The articles are not in pill, capsule or liquid form, nor are they packaged or labeled in a manner suggesting that they are a drug. They were sold with no representations or warranties.

The Government further contends that Heinsohn intended that apricot kernels be used for the prevention and treatment of disease because he is an advocate of the use of a highly controversial substance known as "Laetrile" for the prevention and treatment of cancer. It cannot be doubted that Heinsohn has advocated the use of Laetrile as a supplement to conventional therapy for the treatment of cancer.[6] Laetrile, which is derived from apricot kernels, contains a highly concentrated dosage of amygdalin, the same substance that occurs naturally in apricot kernels, and is generally administered intravenously or in tablet form to cancer patients who believe in its efficacy. See Rutherford v. United States, supra. The Government seeks to equate Laetrile with apricot kernels so as to link all statements made by Heinsohn about Laetrile to the apricot kernels.

This is not a Laetrile case. We are concerned here only with apricot kernels. Although Heinsohn admitted that he has purchased Laetrile in liquid and tablet form for use by his wife, the Government does not seek to condemn Heinsohn's supply of Laetrile. It seeks to condemn apricot kernels, the likes of which may be found in most supermarkets throughout the country and in many of the so-called health food stores.

---

5. An additional exhibit introduced by the Government is a letter and pamphlet mailed by Heinsohn to a number of physicians. The letter requests that the physicians read the pamphlet, which reported the results of a two-day physicians' workshop on metabolic therapy. Metabolic therapy apparently refers to the prevention of disease by diet control.

6. Heinsohn's wife was afflicted with cancer. He believes that her use of Laetrile in addition to conventional cancer therapy has enabled her to overcome the ravages of the disease. He is an ardent supporter of Laetrile and has not been hesitant to make his views known publicly.

He sold the kernels without making any representations or warranties about their efficacy to anyone who wished to buy them for whatever purpose. Under these circumstances we cannot agree with the Government that Heinsohn's statements about Laetrile must be translated into statements about apricot kernels.

Having considered all the evidence of record, the Court is of the opinion, and finds, that the apricot kernels at issue were not intended by the claimant to be used for the prevention and treatment of a disease. Accordingly, they are not a drug as that term is defined in the Act.

For the foregoing reasons, it is ordered that the seized articles be returned, forthwith, to the claimant, Millet, Pit and Seed Company, because they are not in violation of any provision of the Act, and therefore are not subject to condemnation. The Court has been advised by the Marshal that the Government has agreed to pay the storage costs of the articles for the period of time during which they were under seizure by the United States.

Having reached this decision, the Court emphasizes that we have dealt here only with apricot kernels sold in their natural state as a food supplement. We hold only that under the particular facts and circumstances shown at trial that the apricot kernels at issue were neither adulterated nor sold for the prevention and treatment of a disease. We further emphasize that this decision should not be construed as placing this Court's imprimatur on the use of apricot kernels, Laetrile or any other substance for the prevention and treatment of cancer.

II. *Civil Rights Case (3–77–172)*

 The State of Tennessee and the United States Government are both dismissed as improper defendants in Millet, Pit and Seed Company's civil rights action under 42 U.S.C. § 1983.

The individual federal officials are also dismissed as they were not acting under color of State law at the times in question. The Court further finds plaintiff's conspiracy theory to be without merit.

As to the remaining two defendants, Stipe and Reeves, the Court finds no basis upon which the plaintiff could establish an intentional violation of its constitutional rights. Plaintiff admitted that these defendants acted in good faith. Therefore, it is ORDERED that plaintiff's action be, and the same hereby is, dismissed.

Order Accordingly.