UNITED STATES of America, Plaintiff,

v.

71/55 GALLON DRUMS, MORE OR LESS, OF STUFFED GREEN OLIVES IN BRINE, AN ARTICLE OF FOOD, Labeled in Part:

(Drum)

"HNOS. Garcia Gutierrez, S.A. Alcala De Guadaira Sevilla Exporter No. 41126194 Stuffed * * * Manzanilla Olives * * * Size: 340/360 Product of Spain CROP 1.989 Net Weight: B.G. Chicago * * * ", Defendant,

Bob Gordon & Assoc., Ltd., Claimant.

No. 91 C 1400.

United States District Court,
N.D. Illinois, E.D.

March 31, 1992.

Sharon J. Coleman, United States Attorney's Office, Chicago, Ill., for plaintiff.

Zave H. Gussin, Chicago, Ill., for claimant.

## MEMORANDUM OPINION

BRIAN BARNETT DUFF, District Judge.

The government filed a complaint on March 7, 1991 requesting the forfeiture,

seizure, and condemnation of an article of food, in accordance with the Federal Food, Drug, and Cosmetic Act ("The Act"), 21 U.S.C. 301 *et seq.* The article of food referred to was seventy-one 55 gallon drums, more or less, of stuffed green olives in brine.[1] This court has jurisdiction under 28 U.S.C. § 1345 and 21 U.S.C. § 334. The plaintiff and defendant have each filed motions for summary judgment. The government has also requested that if its motion is granted that costs be taxed against the claimant pursuant to 21 U.S.C. § 334(e).

## FACTS

An inspection was prompted after several drums of stuffed paste manzanilla olives located at Thorne Valley, Inc. Grand Rapids, Michigan were identified by the Food and Drug Administration's ("FDA") Detroit District Laboratory as possibly being contaminated with mold. (Kelly Declaration, paragraph 3).[2] Bob Gordon & Associates, Ltd. ("Bob Gordon") was the importer/distributor of those olives. The olives were shipped in interstate commerce on or about October 12, 1990, by Hermanos Garcia Gutierrez, S.A., Sevilla Spain, via ship. (Complaint, paragraph 3).

On December 14, 1990 Ms. Anne Kelly, an FDA inspector, requested to examine samples from the same lot of olives that was shipped to Thorne Valley. Mr. Gordon informed her that he didn't have any olives left from that lot and instead provided her with access to a similar lot.[3] Ms. Kelly states that during the inspection she observed a whitish substance on the drum lid that touched the olives and on the olives themselves. (Kelly Declaration, paragraph 5).

Following the inspection, the government filed a complaint alleging that approximately seventy-one 55 gallon drums of olives were adulterated while being held for sale after shipment in interstate commerce within the meaning of 21 U.S.C. § 342(a)(3); and thus are unfit for food. (Complaint, paragraph 4). The government argued that since these olives were held illegally within the jurisdiction of the court, they were liable to seizure and condemnation. A warrant of arrest *in rem* was issued by this court.

Pursuant to the court's order, a United States Marshall seized the article of food on March 11, 1991. Out of the original seventy-one drums of olives, 24 fifty-five gallon drums were impounded. (Answer to Complaint, paragraph 3B). Subsequent to the seizure, Robert Gordon, as President of Bob Gordon Associates and owner of the food product seized, intervened as claimant. (Memorandum in Support of Plaintiff's Motion for Summary Judgment, p. 2). Mr. Gordon has been in the business of repacking and reselling olives for over 40 years. (Gordon Declaration, paragraph 2).

On April 15, 1991 the court granted the claimant's motion to modify in certain respects the conditions under which the olives were impounded.[4] On June 14, 1991 the plaintiff filed a motion for summary judgment. Pursuant to local rule 12, the government has filed a statement of material facts to which it contends there is no genuine issue. On July 23, 1991, Mr. Gordon, the claimant, filed the requisite 12n statement in response to the plaintiff's motion and his own motion for summary judgment along with a statement of facts to which he contends there is no genuine issue, in compliance with local rule 12. The

1. The article of food was labelled in part: "HNOS. Garcia Gutierrez, S.A. Alcala de Guadaira Sevilla Exporter No. 41126194 Stuffed * * * Manzanilla Olives 888 Size: 340/360 Product of Spain CROP 1.989 NET WEIGHT: 154 KGS * * *".

2. It should be noted that the FDA analysis revealed that no mold was in fact present on the olives. (Handwritten Worksheet of FDA Analyst James T. Karpus, p. 7—Attachment to the Gussin Declaration).

3. Ms. Kelly states that she examined olives from a lot of 71/55 gallon drums of stuffed manzanilla olives, delivery dated December 3, 1990 and imported from Spain. (Kelly Declaration, paragraph 5).

4. The modifications provided for additional testing of the olives and for maintaining proper PH levels for the product pending a final determination of this cause. (April 15, 1991 Agreed Order).

Government has filed the requisite 12n statement in response.

## DISCUSSION

### A. Standard of Review

■ Rule 56 of the Federal Rules of Civil Procedure requires the entry of summary judgment upon either party's motion "if the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." See generally, *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When there is enough evidence in favor of the non-movant so that a jury could reasonably return a verdict for that party, a "genuine issue" exists and summary judgment is not appropriate. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). This court's task, therefore, is to determine which facts are material, in light of the appropriate law, and then whether any of those facts are contested.

### B. 21 U.S.C. Section 334(a)(1)

The government has the authority to seize property upon the filing of a complaint for forfeiture when federal statutory violations are identified. Section 334(a)(1) of 21 U.S.C. provides in pertinent part that:

> Any article of food, drug or cosmetic that is adulterated or misbranded when introduced into or while in interstate commerce or while held for sale (whether or not the first sale) after shipment in interstate commerce ... shall be liable to be proceeded against while in interstate commerce, or at anytime thereafter, on libel of information and condemned in any district court of the United States or United States court of a Territory within the jurisdiction of which the article is found ...

Before the court can grant a decree of condemnation or forfeiture the government must establish the following elements under this statutory provision: (1) that the seized article is food; (2) that the food is held for sale following shipment in interstate commerce; and (3) that the seized article of food is adulterated within the meaning of 21 U.S.C. § 342(a)(3) as alleged. The government maintains that there are no genuine issues of fact regarding any of these elements. The claimant's motion for summary judgment, however, is based on evidence he has submitted for element three of the statutory provision (i.e. Is the food adulterated within the meaning of 21 U.S.C. § 342(a)(3)). The claimant argues that results obtained from the laboratory tests conducted by several experts and summarized in their declarations demonstrate that the olives are fit for food. The claimant maintains that with the disposition of that issue in his favor, there remain no other genuine issues of fact; and thus his motion for summary judgment should be granted.

### 1. Is the seized article food

■ The claimant raises no issue with respect to whether the olives constitute articles of food under the statute. (Claimant's 12n statement, paragraph 3). Under § 321 the term "food" is defined as (1) articles used for food or drink for man or other animals, (2) chewing gum, and (3) articles used for components of any such article. The court may take judicial notice that the olives at issue are food within the meaning of 21 U.S.C. § 321. *United States v. H.B. Gregory Co.*, 502 F.2d 700, 704 (7th Cir.1974).

### 2. Was the food held for sale following shipment in interstate commerce

#### A. Interstate Commerce

21 U.S.C. of Section 321(b) defines "interstate commerce" as, "commerce between any State or Territory and any place outside thereof". The claimant raises no issue with respect to whether the olives were shipped in interstate commerce. (Answer, paragraph 3).

#### B. Were the Olives Held For Sale

The term "held for sale" was designed to extend the coverage of the Act, "to every article that had gone through interstate

commerce until it finally reached the ultimate consumer." *United States v. Sullivan*, 332 U.S. 689, 696, 68 S.Ct. 331, 336, 92 L.Ed. 297 (1948).

It is well established that "all articles, compound or single, not intended for consumption by the producer, are designed for sale, and because they are, it is the concern of the law to have them pure." *Hipolite Egg Co. v. United States*, 220 U.S. 45, 54, 31 S.Ct. 364, 366, 55 L.Ed. 364 (1911) *Gregory*, supra at 704. The claimant admits that he is holding the seized olives for sale and not for personal consumption. Therefore, there is no issue with respect to this element.

*3. Is the article of food adulterated within the meaning of 21 U.S.C. § 342(a)(3)*

The confiscation and condemnation of the olives is sought by the government under Section 342(a)(3) which provides that a food shall be deemed to be adulterated if "it consists in whole or in part of any filthy, putrid, or decomposed substance, or if it is otherwise unfit for food." The government has not alleged that the olives consist of a "filthy, putrid or decomposed substance". Rather the theory being advanced is that the olives are "otherwise unfit for food". The court in *United States v. 133 Cases of Tomato Paste*, 22 F.Supp. 515 (E.D.Pennsylvania, 1938) noted that certain sections of the Act, like the "otherwise unfit for food" provision, were "designed to protect the aesthetic tastes and sensibilities of the consuming public and that the visible presence of . . . [certain] material in food would offend both." *Id.* at 516.

Section 342(a)(3) allows for broad application. The court in *United States v. 449 Cases Containing Tomato Paste*, 212 F.2d 567, 569 (2d Cir.1954) interpreted the statutory language as follows: "The first clause expressly bans all products composed in whole or in part of any filthy, putrid, or decomposed substance; and the second clause goes on to ban the substances which were unfit for food for any other reason." The broad general classification of "otherwise unfit for food" allows for "the widest variety of reasons for condemning a food".

*Id.* at 570. (quoting 67 Harv.L.Rev. 632, 645). The government need not establish that the food is filthy, decomposed or putrid in order to have it condemned as "otherwise unfit for food"; and in fact, the government has not presented any evidence to establish that the olives are contaminated in those ways. See *449 Cases*, supra at 570.

*A. The Standard for Determining Unfitness*

The standard used for determining whether an article of food is unfit is based on consumer perception. The court in *United States v. 24 Cases, More or Less et al.*, 87 F.Supp. 826 (D.Me.1949) applied this standard in determining whether the alleged tough and rubbery consistency of two lots of canned herring roe rendered them unfit. The court in that case asserted that the issue was solely a factual one which must be determined by the court in a trial on the merits. The court further asserted that "the product must be proved to be so tough and rubbery that the average, normal person, under ordinary conditions would not chew and swallow it." *Id.* at 827. The court in *Millet, Pit and Seed Company, Inc. v. United States*, 436 F.Supp. 84 (E.D.Tennessee, 1977) generalized this standard by asserting that an article of food is "otherwise unfit for food" if it is "inedible for the average person under ordinary conditions."

■ The burden of proof rests on the government to establish by a "fair preponderance of the evidence" that the article of food is adulterated within the meaning of § 342(a)(3). *Id.* at 87, 88; See *United States v. Tins of Strawberries*, 175 F.Supp. 694, 699 (D.Ark.1959). Applying that standard to this case, the court must determine whether the government has provided sufficient proof to find that the seized olives are inedible for the average person under ordinary conditions.

The government offers the declaration of FDA inspector Anne E. Kelly, in support of its assertion that the olives should be seized and condemned. Ms. Kelly states that she along with Christine H. Kujawski, a consumer safety officer and investigator

for the FDA, conducted an inspection of Bob Gordon & Associates, Ltd. (Kelly Declaration, paragraph 2). Ms. Kelly further states that, during the inspection she photographed one of the lids of the drums in which some of the olives were stored. A copy of the photograph of the drum lid is provided as exhibit 1. The copy, however, is not very clear, and is lacking in detail making it difficult for the court to draw any conclusions. The FDA report for this inspection indicates that Ms. Kelly collected a sample consisting of 36 (1 quart) jars of olives with brine or approximately 3 jars from each drum. This sample was assigned the number 91–576–677 (hereinafter the sample will be referred to by number). A laboratory analysis of 6 subsamples of 91–576–677 revealed the presence of yeast in all 6 of the 6 subsamples. (Declaration of James T. Karpus, laboratory analyst for the FDA, paragraph 4). According to Mr. Karpus, the percentage by count of olives contaminated ranged from 91.7 to 100.0%. Mr. Karpus further stated that the stuffing cavity in some of the olives contained yeast. (Karpus Declaration, paragraph 4).

■ The claimant does not contest the findings of the presence of yeast by the FDA inspectors. (Claimant's 12n statement, paragraph 8). Rather, the claimant asserts that yeast is normal and naturally occurring in this product, that it is harmless when proper ph levels are maintained, and that proper ph levels have in fact been maintained.[5] (Claimant's Memo in Support of its Motion for Summary Judgment, p. 5).

The claimant, however, raises an issue, differentiating between the condition in which the olives are maintained when stored in bulk and when they are prepared for sale to consumers. He asserts that, in contrast to when the olives are received and stored in bulk shipping drums, the product as sold to consumers is washed, rinsed, re-packed and "rebrined". (Claim-

ant's 12n statement, paragraph 5). The claimant maintains that the samples taken by the FDA did not allow for his routine process of flushing and repacking the olives; and consequently true and representative results were not obtained. (Answer to Complaint, paragraph 7). He now seeks to introduce evidence regarding the condition of the olives when they are sold to the consumer as a finished product.[6] The government argues that the claimant's references to this washing process are irrelevant and that to allow the claimant to hold the olives in an adulterated state and avoid the scope of the Act by cleaning the olives prior to their distribution to consumers would nullify a major feature of the Act's consumer protection provisions. (Government's Reply, p. 8).

The opinion in *United States v. O.F. Bayer & Co.*, 188 F.2d 555 (2d Cir.1951) supports the government's position in stating that the scope of the Act is broad enough so that "food which is adulterated may be condemned even though it is intended to have the adulteration eliminated by a future process." *Id.* at 557. See *United States v. Wiesenfeld Warehouse Co.*, 376 U.S. 86, 92, 84 S.Ct. 559, 563, 11 L.Ed.2d 536 (1964). (The purpose of the Act is, "to safeguard the consumer from the time the food is introduced into the channels of interstate commerce to the point that it is delivered to the ultimate consumer"). Further support for the government's position is provided by the case of *United States v. Bodine Produce Co.*, 206 F.Supp. 201 (D.Ariz.1962), in which the court specifically dealt with the issue of allowing for a cleaning process. In *Bodine*, the government alleged that the defendant was holding for sale lettuce which contained excessive quantities of DDT in violation of 21 U.S.C. § 342(a)(2)(B). The defendant maintained that once the lettuce was introduced into the retail process it

---

5. The claimant indicates that high ph levels could render the olives harmful to consumers. (Claimant's Motion for Summary Judgment, p. 7). Maintaining certain ph levels is also necessary to prevent the deterioration of the olives. (Motion to Modify Impoundment Order, paragraph 4).

6. According to his declaration, Mr. Flowers conducted a laboratory analysis on a sample jar of olives that had been washed, rinsed, repacked and "rebrined".

was subjected to trimming; and that this was "a form of 'processing' which brings the lettuce within the ... [accepted tolerance level of DDT]." *Id.* at 209. Therefore, the defendant concluded, a conviction was only proper upon a showing that the lettuce contained excessive quantities of DDT after it reached its retail market destination. *Id.* at 208. The court rejected this argument, asserting that:

> If this were a good defense, it is obvious that the law would be completely unenforceable. The general philosophy of this law is to nip the violation in the bud as close to the source as possible ... Evidence of allegedly "corrective" action which may be undertaken at destination has no bearing on the issue of whether the product was adulterated when introduced or delivered for introduction into interstate commerce.

*Id.* at 209.

Applying this reasoning to the case before the court, the claimant's argument that the government's failure to test a sample of the olives after they had undergone this washing process, bars the application of § 342(a)(3) must be rejected.

■ In cases such as these, where the condemnation of an article of food is sought even though the article has not been alleged to be injurious to the public, the decision hinges on consumer perception. While the product's appearance is a factor in consumer perception, the decisive factor rests on the tastes and expectations of the consumer. If it is true that olives do not usually have a yeasty flavor, then it is a fair conclusion that the ordinary consumer would be dissatisfied with a jar containing olives that have a heavy yeasty flavor. The flavor of the olives, however, has not been established. Consequently, the court is left to evaluate the declaration of Mr. Paris M. Brickey, the sole piece of evidence offered to establish that consumers would find the olives inedible, rendering them unfit for food. Mr. Brickey is Chief of the Microanalytical Branch, Division of Microbiology, Center for Food Safety and Applied Nutrition for the FDA. He concluded that:

> Although such a product as brined olives may contain some yeast, the olives in this case have become unfit for food due to the heavy accumulation of yeast on and among the olives. Olives with this heavy accumulation of yeast will look rotten and have a yeasty smell and taste. Consumers would find the olives offensive and would not eat them in such a condition.

(Brickey Declaration, paragraph 10).

Mr. Brickey based his conclusions on the FDA laboratory analysis and photographs from the FDA investigation. (Brickey Declaration, paragraph 7). The government has not made any assertions or presented any evidence that Mr. Brickey ever saw, smelled or tasted the olives. The government asserts that Mr. Brickey's declaration provides ample support to establish the fact that consumers would consider the olives inedible because of the presence of heavy accumulations of yeast. (Plaintiff's Memo in Support of Motion, p. 7).

Contrary to this assertion the Brickey declaration does not establish that these olives will look rotten and have a yeasty odor and taste to consumers. That statement is Mr. Brickey's opinion. Regardless of Mr. Brickey's impressive credentials, this court must scrutinize carefully the basis upon which Mr. Brickey rests his opinion. He did not in fact examine the seized olives. A first hand inspection of the seized product would seem to be a crucial component in making such an evaluation of whether the olives are unfit for food. Mr. Brickey's declaration is insufficient to establish this fact. Given that this is the only evidence offered to establish the unfitness of the product, the court concludes that the government has failed to meet its burden of establishing by a fair preponderance of the evidence that the olives are unfit for food.

The claimant counters Mr. Brickey's statements with the declaration of Dr. Russell S. Flowers, Jr. who holds a Ph.D. in Food–Science Microbiology and is President of Silliker Laboratories Group, Inc. Mr. Flowers states that he ate olives directly from at least two of the impounded drums. Based upon his inspection, he concluded

that "the impounded olives [he] observed were not offensive visually, nor to the smell, taste or in any other way." (Flowers' Declaration, paragraph 8). In addition to the submission of Mr. Flowers' declaration and the declarations of four other individuals, including the claimant's, who assert that the olives they sampled by tasting were normal in flavor, the claimant refers to the absence of complaints regarding the olives that were sold before the government seized them.[7] It is difficult to overlook the self-serving nature of these statements. As with Mr. Brickey's declaration the court must carefully scrutinize these conclusions.

Given the conflicting assertions, the court is confronted with the question of whether resolving the issue of consumer perception is merely a matter of deferring to the judgment of FDA inspectors. If an FDA inspector determines that consumers under ordinary conditions would find the product inedible does that end all debate on the question of whether the product is unfit for food? Or, is the FDA required to present, in support of its own independent determinations, evidence such as statistical surveys on consumers and their tastes. The claimant has provided this court with a jar of the seized olives as exhibit 1 to Mr. Zave H. Gussin's declaration.[8] With regard to the question of whether the court may properly examine this evidence for the purposes of the summary judgment motions, the general rule is that the court may consider any material that would be admissible or usable at trial. (Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d § 2721, p. 40). Upon examination of the exhibit jar, this court has identified the presence of brown speckles on some of the olives. There are limits on the conclusions that can be drawn from this visual inspection. Without arranging for some kind of taste test to be conducted by the court or a panel, the court cannot confirm the conclusions reached by either party regarding the flavor of the olives.

The FDA serves an important regulatory role. The court can appreciate the difficulty in establishing consumer responses according to the standard, short of asking consumers to sample the product for themselves. It seems, however, that at the summary judgment stage something more is needed to meet the fair preponderance standard than a prediction of consumer reaction by an FDA Scientist, who has not himself examined the article of food in question. A summary judgment motion cannot be granted merely because the court believes that a movant will prevail if the action is tried on the merits. (Wright, Miller & Kane, Federal Practice and Procedure, Civil 2d § 2728, p. 186). Once the court determines that a triable issue of fact exists, for the purposes of the summary judgment motion, the court's inquiry is at an end; and the motion for summary judgment must be denied. (Wright, Miller & Kane § 2728, p. 186). Given the evidence on both sides regarding whether the olives are "unfit for food" within the meaning of § 342(a)(3), it is clear that this remains as a triable issue of fact. Therefore both the government's motion and the claimant's motion for summary judgment are denied.[9]

A bench trial will be held to resolve the remaining issue of the fitness of the olives. At which time a taste test will be conducted.

## CONCLUSION

For the foregoing reasons the summary judgment motions for both parties are denied.

---

7. Mr. Gordon asserts that 47 drums from the same shipment of the now impounded olives were sold. He maintains that he has received no complaints of any customer rejection or dissatisfaction. (Gordon Declaration, paragraph 6).

8. Mr. Gussin is the claimant's attorney. (Gussin Declaration, paragraph 1).

9. The court has ruled on each party's motion on an individual basis, determining, in each case, whether a judgment may be entered in accordance with the Rule 56 standard. (Wright, Miller & Kane, Federal Practice & Procedure, Civil 2d § 2720, p. 24).